# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNIVERSAL ATLANTIC SYSTEMS, INC., <br> **Plaintiff,** <br><br> v. <br><br> HONEYWELL INTERNATIONAL, INC., <br> **Defendant.** | CIVIL ACTION <br><br><br> NO. 17-4660 |

## MEMORANDUM OPINION

Plaintiff alleges that Defendant agreed to create software and hardware to permit its analog surveillance video technology to function on the next generation of IP video technology. When Defendant scrapped those plans, Plaintiff and its clients were left in the lurch. This is a suit for breach of contract, promissory estoppel, and tort claims arising out of Defendant's alleged breach. Defendant has filed a Motion to Transfer Venue or in the alternative a Motion to Dismiss. For the reasons below, Defendant's Motion to Transfer Venue will be denied and its Motion to Dismiss will be granted in part and denied in part.

### I. FACTS

Plaintiff, Universal Atlantic Systems, Inc. ("Universal") sells, installs, customizes, monitors, and services integrated security systems across the nation. Its customers include prominent national companies in the restaurant, convenient store, and retail establishment sectors. Defendant, Honeywell International, Inc., ("Honeywell") is a diversified technology and manufacturing leader in various fields. As relevant in the present lawsuit, Honeywell is involved in the manufacturing and sale of security monitoring equipment, including hardware and software components.

For over forty years, Honeywell sold security monitoring hardware to Universal. Between 2000 and 2017, Universal purchased over $53,000,000 in products from Honeywell, which it then sold to its own clients. Although the parties sound as if they operated in a traditional manufacturer-distributor relationship, Universal insists that the term does not capture the reality of their relationship. Universal calls it an "unprecedented partnership" where the parties collaborated on the development of new technology, which Universal would purchase from Honeywell on an exclusive basis.

This "unprecedented partnership" led, first, to the development of Rapid Eye, Universal's flagship security monitoring product, which the parties continued to develop over the years. In 2008, the parties worked together to develop a back-end video reporting system called Rapid Eye Reports ("RER"), which allowed Universal to provide its customers access to information and reports regarding its security monitoring software. The "unprecedented relationship" involved regularly scheduled product development meetings, as well as working together on hardware and software modifications and improvements. These meetings, including those related to RER, culminated in a custom made, private-labeled product called RAVEN, which Honeywell sold exclusively to Universal. In turn, Universal sold or leased approximately 6,000 video systems under the RAVEN brand, which it had purchased from Honeywell.

But, technology quickly changed. In 2010, CCTV technology based on IP video started to replace the analog video technology upon which RAVEN was based. Honeywell developed new IP technology to meet new technology needs of its consumers. The new IP-based technology was sold under the name MaxPro. Plaintiff alleges that "Honeywell agreed, with its conduct, writings and express representations, and in accordance with the parties' joint development understanding and their prior course of dealing and performance, to design MaxPro

2

for [Universal] in a manner that would allow for the seamless integration of the then-current RAVEN system with the then-evolving IP technology to include RER. . . ."

According to Plaintiff, the parties entered an "implied-in-fact contract whereby Honeywell agreed to develop the necessary software and related technology to ensure that [Universal's] RAVEN technology would integrate with the new MaxPro IP based technology and that [Universal's] customers would be able to use a Single Sign-on Platform." Universal calls this arrangement the "Integration Agreement." Specifically, Universal alleges that Honeywell manifested its assent to the Integration Agreement in 2011 when Honeywell's Rapid Eye Product Manager wrote to Universal's President:

> We cannot be more aligned on the need to have [Universal] as our partner for driving this initiative. We have no plan to obsolete [RAVEN] before our customers are ready to transition to [MaxPro]. . . . The bottom line is this is not a Honeywell decision but a [Universal] one! We will present you with options and we will work together on implementation.

Over the next three years, Honeywell and Universal worked together to design MaxPro for Universal in a manner that would support the integration of RAVEN technology. During those three years, Honeywell reiterated its commitment to the Integration Agreement. Specifically, Honeywell's Rapid Eye Product Manager prepared a PowerPoint presentation for Universal called "MAXPRO VMS Clip & Email Get Well Plan" on February 17, 2014. The presentation included a slide showing a three-phase plan related to MaxPro. The second phase involved "supporting more than 250-300 RAVENS per MaxPro server." That phase was labeled as "in progress" and "in design." The third phase, which involved "integrated management" of RER, was noted as "in definition." On March 19, 2014, Scott Harkins, the President of Honeywell Security Products told Universal that Honeywell would "not leave your existing customers stranded." On April 25, 2014, Harkins wrote to the VP of Sales of Universal that "the

Phase 3 portion will be developed in sprints with ongoing releases that can begin by the end of September and will likely continue over the course of several quarters."

The nature of Universal and Honeywell's relationship changed in the fall of 2014 when key Honeywell representatives either left or their responsibilities were shifted. On September 22, 2014, one of the new relationship managers, Michael Trilk, wrote to Universal's President that Honeywell "can not [sic] commit to any new development on RER/Raven head-end software solution moving forward." And, in May, 2015, Honeywell announced that Universal's RAVEN system would be subject to an "End of Life" statement. Universal alleges that Honeywell's decision to end its support for the RAVEN system required it to spend $18,000,000 to acquire replacement systems.

Universal's claim is for breach of contract, promissory estoppel, intentional interference with contract, and negligent misrepresentation. Honeywell moves to transfer venue under 28 U.S.C. 1404(a) or to dismiss claims against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II. MOTION TO TRANSFER VENUE

### a. Legal Standard

Honeywell's Motion to Transfer Venue relies on a written License Agreement entered into between the parties in March, 2013, which is not attached to or referenced in the Complaint, but which Honeywell appends to its motion. The agreement gives Universal a one-year distribution license for the "Raven End User – Application." It also contains a forum selection clause which states that "all disputes hereunder shall be governed by the laws of the State of New York, excluding conflict of law rules. Each of the parties hereto irrevocably consents to the jurisdiction of the Federal and State courts in New York, New York to the exclusion of other

courts." A court may consider affidavits and other evidence outside the pleadings when adjudicating a motion to transfer under 28 U.S.C. § 1404(a). *See e.g.*, *Huang v. Napolitano*, 721 F. Supp.2d 46, 47 n.2 (D.D.C. 2010).

When the motion is premised on a forum selection clause in a contract, first, "a district court must determine whether the forum-selection clause is valid and enforceable." *Silvis v. Ambit Energy, L.P.*, 90 F. Supp.3d 393, 397 (E.D. Pa. 2015) (citing *Atlantic Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 581 (2013). Next, "a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." *Atlantic Marine*, 134 S. Ct. at 582. Last, the court must weigh the private and public interests in favor or against transferring venue. *Id*. When a valid and enforceable forum-selection applies, the private considerations weigh in favor of enforcing the forum-selection clause and the public factors will "rarely defeat a transfer motion." *Id.*

### b. Discussion

Given the language of the forum selection clause, there is nothing to suggest it is not enforceable – and Universal does not argue to the contrary. It contends, however, that its breach of contract claim arises out of the Integration Agreement and does not implicate the License Agreement. In other words, its argument is that this dispute falls outside the scope of the License Agreement and is thus not governed by that Agreement's forum selection clause. The interpretation of the scope of a forum-selection clause is governed by state law because it is substantive. *See Collins on behalf of herself v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017).

In *Mary Kay,* the Third Circuit stated that the scope of a forum selection clause is determined using traditional principles of contract law. *Id.* at 183. In this case, the use of the

word "hereunder" in the forum-selection clause in the License Agreement – "all disputes *hereunder*" shall be decided in New York – is interpreted narrowly compared with such terms as "arising out of" or "relating to."  *See IDT Corp. v. Clariti Carrier Servs., Ltd.,* 772 A.2d 1019, 1022 (Pa. Super. 2001) (citing *John Wyeth & Brother Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070 (3d Cir. 1997) (distinguishing forum selection clauses with broad language); *Morgan Trailer Mfg. Co. v. Hydraroll, Ltd.,* 759 A.2d 926, 932 (Pa. Super. 2000) (holding that non-contract claims are not subject to a forum-selection clause with "hereunder" phrase); *see also Triple Z Postal Servs., Inc. v. United Parcel Serv., Inc.,* 831 N.Y.S.2d 357 (Sup. Ct. 2006) (distinguishing narrow forum selection clauses applying to "disputes arising . . . hereunder" from broad clauses applying to "disputes related to" the subject contract).[1]  Thus, the forum-selection clause in the License Agreement only requires venue in New York for claims pertaining to that contract, as opposed to disputes that may be related to that contract.

Furthermore, principles of contract interpretation also dictate that the forum-selection clause may be limited to the subject matter of the License Agreement.  Both Pennsylvania and New York law provide that a forum-selection clause in one contract does not govern a dispute arising out of a separate contract.  *See Gary Lorenzon Contractors, Inc. v. Allstates Mech., Ltd.*, 52 Pa. D. & C.4th 567 (Com. Pl. 2001) (refusing to transfer venue where case arose primarily out of disputes in one construction subcontract even though the parties executed a written

---

[1] Defendant cites two Third Circuit cases, interpreting Pennsylvania law, involving forum-selection clauses.  Neither case is applicable to the present dispute.  In *Crescent Int'l, Inc. v. Avatar Communities, Inc.*, 857 F.2d 943 (3d Cir 1998), the Third Circuit held that claims of RICO violations and other torts were still subject to a contractual forum-selection clause because "the claims asserted arise out of the contractual relationship and implicate the contract's terms." *Id.* at 944.  Similarly, in *Coastal Steel Corp. v. Tilgham Wheelabrator, Ltd.*, 709 F.2d 190 (3d Cir. 1988), the Third Circuit enforced a forum selection against a third party beneficiary of a contract between two British firms because the beneficiary's product defect allegations implicated the contract between the two British firms. *Id.* at 203 (holding that the written agreement between the two British firms was "the basic source of *any* duty to [plaintiff].).  In both cases, the Third Circuit was concerned that "artful pleading" of contract claims as tort claims might defeat a valid forum-selection clause where the duties owed to both parties arose from a contract. *See id.* at 201.  This is not the case here.

subcontract for a different project which included a forum-selection clause); *see also DeSola Grp., Inc. v. Coors Brewing Co.*, 199 A.D.2d 141 (N.Y. App. Div. 1993) (finding, under New York law, that a forum selection clause in a contract pertaining to research does not govern the parties' oral agreement to provide separate marketing services). The forum selection clause in the License Agreement, by its language, applies to that agreement, but is silent about any other agreements.

Plaintiff argues that its claims arise under the Integration Agreement and not the License Agreement. It appears from the text of the License Agreement that it relates solely to an application available for download from the Apple Application Store or Google Apps Marketplace and that it is intended for mobile devices. The License Agreement further shows that it is for a pre-existing application. In contrast, the alleged Integration Agreement involves the design and development of a future, integrated software and hardware system to support purchasers of analog RAVEN technology on the MaxPro system supported by IP video. Additionally, on February 17, 2014, after the parties entered into the License Agreement, Honeywell provided a PowerPoint presentation explaining that it was working to develop a new database to integrate RAVEN and MaxPro. While the License Agreement concerned already developed technology, it is clear from the PowerPoint presentation, that the Integration Agreement involved technology under development. Thus, this dispute, as currently pled – and absent the benefit of discovery – is not governed by the forum selection clause in the License Agreement.

Absent a forum selection clause, a court may still transfer venue under the federal venue statute, 28 U.S.C. § 1404(a). The venue statute provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other

7

district or division where it may have been brought. . . ." 28 U.S.C. 1404(a). The burden of establishing the need to transfer venue rests with the movant. *See Shutte v. Armco Steel Corp.*, 431 F.2d 22 (3d Cir. 1970), *cert. denied*, 401 U.S. 910 (1971). And, in general, the Plaintiff's venue choice "should not be lightly disturbed." *Jumara*, 55 F.3d at 879. A motion to transfer venue requires the court to weigh both private and public interests. *See id.*[2] In this case, the private interests weigh against transferring venue to New York because Plaintiff brought suit in this district and resides in this district, many of the witnesses and much of the evidence are located in this district, and Defendant is a Delaware corporation with a principal place of business in New Jersey, both of which are in this circuit. Importantly, Defendants have not proffered any reason why the private interests weigh in favor of a transfer to New York. The public interests also weigh against transferring venue because any judgment would be just as easy, if not easier, to enforce in this district, it will be cheaper for the parties to litigate here, and this district has an interest in deciding local controversies at home. Therefore, Defendant's Motion to Transfer Venue will be denied.

## III. MOTION TO DISMISS

### a) Standard

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

---

[2] The private interests include "plaintiff's forum preference as manifested in the original choice, the defendant's preference, whether the claim arose elsewhere, the convenience of the parties . . . the convenience of the witnesses . . . and the location of books and records." *Id.* (citations omitted). The public interests include "the enforceability of the judgment, practical considerations that could make the trial easy, expeditious, or inexpensive, the relative administrative difficulty in the two fora resulting from court congestion, the local interests in deciding local controversies at home, the public policies of the fora, and the familiarity of the trial judge with the applicable state law in diversity cases." *Id*. (citations omitted).

reasonable inference that the defendant is liable for the misconduct alleged. *Id.* "'[S]tating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 177 (3d Cir. 2010) (quoting *Twombly*, 550 U.S. at 556). "In light of *Twombly*, 'it is no longer sufficient to allege mere elements of a cause of action; instead a complaint must allege facts suggestive of [the proscribed conduct].'" *Id.* (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). "In other words, 'there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation.'" *Id.* (quoting *Phillips*, 515 F.3d at 234-35). That showing cannot be made through conclusions, but requires well-pled factual allegations. *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). In determining the adequacy of those well-pled allegations to state a cause of action, the Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to plaintiff." *Warren Gen. Hosp. v. Amgen, Inc.*, 643 F.3d 77, 84 (3d Cir. 2011).

    **b) Discussion**

        *i. Breach of Contract Claim*

Honeywell makes two arguments in support of its motion to dismiss Universal's breach of contract claim. First, Honeywell argues that the so-called "Integration Agreement" – upon which Plaintiff's contract claim is based – is an implied agreement, and, as such, it is not an enforceable requirements contract under the UCC. Second, the UCC requires a signed, written agreement as to price and quantity in order to make a contract enforceable. Both of these

9

arguments rely on the preliminary assumption that the UCC applies to the Integration Agreement.

The UCC, as adopted in Pennsylvania, governs transactions in goods. *See* 13 Pa.C.S.A. § 2102. "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale. . . ." 13 Pa. C.S.A. § 2105(a). In contrast, the UCC does not apply to contracts for services. Whether or not an alleged contract is one for the sale of goods, and therefore governed by the UCC, is determined according to a two-step analysis. The first step is to determine whether there is a "significant service component" to the alleged contract. *See* Williston on Contracts § 26:20 (4th ed.). In this case, the Integration Agreement contemplates development, training, and support services. It thus includes a "significant service component." If there is a significant services component, then, the second step is to apply the "predominant purpose" test. *See Advent Sys. Ltd. v. Unisus Corp.*, 925 F.2d 670, 674 (3d Cir. 1991). "We consider the purpose or essence of the contract." *Id.* at 675 (interpreting Pennsylvania law). Some of the factors to weigh include: (1) the relative costs of the materials supplied with the costs of the labor; (2) the compensation structure of the agreement; (3) the language and circumstances surrounding the contract; and (4) the "essence" of the agreement. *See id.* at 676; *see also* 9 Williston on Contracts § 26:20 (4th ed.) (listing factors).

Interpreting Pennsylvania law, the Third Circuit has held that the predominate purpose of a contract for the purchase of software is generally one for goods. *See Advent Sys.*, 925 F.2d at 674; *see also Lobianco v. Prop. Prot., Inc.*, 437 A.2d 417, 419 (Pa. Super. 1981) (applying the UCC to the sale of a burglar alarm system). However, the Integration Agreement provides for a mix of products (the hardware and software) and services (design, support, and integration).

Although a contract for the sale of software is a governed by the UCC, *see id.*, "[a] contract for the *development* of a software system is not identical to a contract for the sale of a software system." *KSM Assocs. v. ACS State Healthcare, LLC*, 2006 WL 847786, at *5 (E.D. Pa. 2006) (emphasis in original). Reading the complaint in the light most favorable to the Plaintiff, as is required at this stage, it is plausible that the predominant purpose of the Integration Agreement is for services. This is ultimately a matter for further fact development.

In a reply brief, Honeywell also argued that the Integration Agreement is unenforceable because it lacked consideration. "While a contract implied-in-fact may arise when two parties impliedly agree to perform certain duties, such a contract, as all others, will only arise when there is an exchange of legal consideration." *Commonwealth Fed. Sav. & Loan Ass'n v. Pettit*, 586 A.2d 1021, 1024 (Cmwlth. Ct. Pa. 1991). "Consideration is defined as a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." *Stelmack v. Glen Alden Coal Co.*, 339 Pa. 410, 414 (1940). Plaintiff's Amended Complaint alleges that the consideration for the Integration Agreement was that (1) Universal would assist Honeywell in the development of the software; (2) Universal would purchase from Honeywell all necessary hardware to meet its customers' demands; and (3) Universal would continue to purchase substantial products and services from Honeywell from at least 2014 with the understanding that the parties had a contract to develop future software. The first two forms of consideration state a "benefit" to Honeywell and the third states a "detriment to the party to whom the promise is made." As such, Plaintiff has adequately alleged consideration.

Therefore, Honeywell's Motion to Dismiss Count One will be denied.

> *ii. Promissory Estoppel*

Honeywell's argument to dismiss Plaintiff's claim for promissory estoppel is premised on the argument that the "Integration Agreement" alleged by the Plaintiff is an implied promise that cannot support the claim. As a preliminary matter, Pennsylvania has adopted the doctrine of promissory estoppel as set forth in Section 90 of the Restatement (Second) of Contracts. *See Central Storage & Transfer Co. v. Kaplan,* 410 A.2d 292, 294 (Pa. 1979). To state a claim for promissory estoppel, a plaintiff must allege the following: "(1) the promisor made a promise that would reasonably be expected to induce action or forbearance on the part of the promise; (2) the promise actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *Pratter v. Penn Treaty Am. Corp.*, 11 A.3d 550, 562 (Pa. Commw. 2010).

As to the first prong, a "broad and vague implied promise" will not suffice to maintain a claim for promissory estoppel. *C&K Petroleum Products, Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988); *see also Bull Int'l, Inc. v. MTD Consumer Grp., Inc.,* 654 F. App'x 80, 100 (3d Cir. 2016) (affirming dismissal of promissory estoppel claim on a motion to dismiss based on an "implied promise" to "continue to do business indefinitely.").[3] In *Petroleum Products*, the Third Circuit upheld the dismissal of a promissory estoppel claim on a motion to dismiss because the parties did not make any "express" promise. The plaintiff was a supplier of petroleum products who had sold a large quantity of products to a distributor, who would then sell the products to end-users. It was typical for the distributor to write checks without sufficient funds because it

---

[3] Universal's citation to *CMR D.N. Corp. v. City of Philadelphia*, 2008 WL 4055823, at *2 (E.D. Pa. 2008), an unreported decision stating that Pennsylvania law does not require a plaintiff asserting promissory estoppel to allege an "express promise," is unhelpful. The district court later found that "encouragement" to develop a real estate project was "not sufficient to support a promissory estoppel claim. *CMR*, 829 F. Supp.2d 290, 304-05 (E.D. Pa. 2011), *aff'd* 703 F.3d 612, 635 (3d Cir. 2013). Affirming this result, the Third Circuit held that "it is a basic tenet of contract law that 'mere expression[s] of intention, hope, desire, or opinion which shows no real commitment, cannot be expected to induce reliance.'" *CMR*, 703 F.3d at 634 (citing *Petroleum Products*, 839 F.2d at 192).

took time to sell the products to end-users. For a long time, the distributor's bank, Equibank, would cash the checks for the distributor's creditors, including the plaintiff, even though the account lacked sufficient funds. As the distributor's credit deteriorated, Equibank stopped honoring those checks despite its long-standing practice of doing so. The key holding in *Petroleum Products* was that estoppel is not necessarily implied from silence or from a pattern of business dealing.

Nevertheless, *Petroleum Products'* requirement to allege an "express promise" has been applied to dismiss claims even where the parties alleged a series of express communications, but where the statements were too "broad or vague" to support estoppel. Three persuasive decisions from this district have cited *Petroleum Products* and, in analogous circumstances, found no express agreement among parties who engaged in lengthy bi-lateral relationships, negotiations, and discussions. In *KSM Associates*, another case in which the defendant allegedly agreed to create new software for the plaintiff, the court held that the lack of definite terms rendered any statement regarding a promise to develop software "too broad and vague." *KSM Assocs., Inc.*, 2006 WL 1308267, at *2 (E.D. Pa. 2006).[4] In *Burton Imaging Grp. v. Toys "R" Us, Inc.*, the court held that the statement during a negotiation "we're going to move ahead with you" was too "broad or vague" to maintain a claim for promissory estoppel for a contract to provide advertising technology. 502 F. Supp.2d 434, 439 (E.D. Pa. 2007). And in *ProgenyHealth, Inc. v. CareSource Mgmt. Grp., Co.*, the court dismissed a promissory estoppel claim even though defendants made countless express statements assuring plaintiffs that they would execute a

---

[4] Those statements included: (1) a series by defendant's product manager that he was preparing and finalizing an agreement between the parties; (2) a statement by one of the defendant's employees during a weekly conference call that it had "hired [plaintiff] to do whatever it takes to make" a particular deadline; and (3) a statement by the defendant's product manager that the plaintiff should include certain costs in its final invoice and that he would "see what he could do" about payment of those costs. *Id.* at *3.

13

contract and "were working as 'partners' throughout [contract] negotiations." 2017 WL 2618879 (E.D. Pa. 2017).

The district court decisions reflect the Third Circuit's extension of *Petroleum Products'* holding to dismiss estoppel claims involving express communications. *See Bull Int'l*, 654 F. App'x at 80 (upholding motion to dismiss estoppel claim based on implied contract to do business indefinitely); *Ankerstjerne v. Schlumberger Ltd.*, 155 F. App'x 48, 51 (3d Cir. 2005) (finding multiple statements that Plaintiff would get paid such as assurances that defendant "would get it taken care of" and "'it was ridiculous' [Plaintiff] had not been compensated" too broad and vague); *see also Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 100 F. Supp.2d 1086 (C.D. Cal. 1999), *aff'd*, 352 F.3d 367, 381 (9th Cir. 2003) (dismissing promissory estoppel claim on a motion to dismiss where defendant's statements were "not definite enough" to establish an estoppel claim).

Like the plaintiffs in *KSM, Burton,* and *ProgenyHealth,* Plaintiff marshals a laundry list of interactions over a number of years, which, taken together, it argues, amount to the required "express" promise. The allegations of the Complaint concerning an express promise are as follows:

(1) On February 3, 2011, Honeywell's Rapid Eye Product Manager, Mr. Van der Elst, emailed various members of the Universal team and stated: "We have no plan to obsolete [RAVEN] before our customers are ready to transition to [MaxPro]" and "We will present you with options and we will work together on the implementation."

(2) In another email on February 3, 2011, Scott Harkins, a member of Honeywell's Senior Management, emailed members of the Universal team and stated: "You can be assured that you will be part of this development in as much detail as you desire."

(3) On February 6, 2013, a manager from Universal wrote to Honeywell stating that the parties "need to focus on . . . Integration (provide RER support for all devices connected to MaxPRO as well as RAVEN)." In response, Van der

14

Elst wrote "Brian – Thanks I added Benjamin to the CC list."

(4) In early August of 2013, Mr. Harkins of Honeywell wrote to Mr. Elkins, the President of Universal that he "agreed and would take steps to ensure the required support was in place" in reference to the subject "QA tech on site fixing RER and MaxPro."[5]

(5) On August 16, 2013, a technical manager with Honeywell wrote to Scott Walker, a manager at Universal, providing a "rough schedule of events to take place over the next 30 days." The expected outcome of the work-period was to stabilize RER and MaxPro.

(6) On September 24, 2013, Walker (Universal) wrote to Harkins (Honeywell) about continued problems with the RAVEN system. He stated "I don't know what it is going to take to get our issues resolved, but again, what we are doing today is not enough. . . . I would love to be able to move on to MaxPRO NVR and MaxPRO Cloud, but can't." A few days later, Harkins replied that "[t]his has been exceedingly difficult to resolve but I am committed to close this issue out and our team understands that clearly."

(7) On November 7, 2013, Walker (Universal) wrote to Harkins (Honeywell) stating that "these issues are beyond our fixing. . . ." Harkins replied, "I am teaching [sic] out to team to be sure all are involved."

(8) On February 17, 2014 Van der Elst (Honeywell) provided Universal with a PowerPoint presentation entitled "MAXPRO VMS Clip & Email Get Well Plan." The presentation showed that plans to integrate RAVEN with MaxPro were "in design" and "in definition."

(9) On March 19, 2014, Harkins (Honeywell) emailed Elkins (Universal) and stated "I have received a complete and very detailed review from our technical staff on the transition path from [Universal's] current RAVEN solution to a next generation solution that does not leave your existing customers stranded but will support existing RAVEN system and provide an upgrade path to a next generation RAVEN."

(10) On April 25, 2014, Harkins (Honeywell) emailed Elkins (Universal" and stated that Honeywell was working on the new technology "in sprints" that "will likely continue over the course of several quarters."

As the detailed recitation of each of these interactions show, none of these writings evidence an "express" promise to do anything. Instead, in the first two emails, Honeywell referred to developing the technology as a "plan." The third email does not even acknowledge

---
[5] The Complaint offers no further details to clarify the context of this email exchange.

an agreement to do anything except forward Universal's concerns to another person. The fourth, fifth, sixth, and seven emails involve Universal's complaints about bugs and defects. Nothing in them suggests an express promise to create a new technology. Instead, Honeywell is merely providing ongoing support.

The eighth, ninth, and tenth emails come closest to an express promise, but again, they miss the mark. These emails refer to a plan to develop new software. The phases are described as "in design" and "in definition." Honeywell referred to its plans as "likely continu[ing] over the course of several quarters." None of these communications demonstrate any kind of express promise to develop Universal's requested software and hardware. Instead, they describe future plans and visions.

Accordingly, Plaintiff's Complaint fails to state a claim for promissory estoppel.

### iii. Intentional Interference with Contract and Negligent Misrepresentation

Defendant also seeks dismissal of claims for intentional interference with contract and negligent misrepresentation, each of which carry a two-year statute of limitations. *See CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.,* 357 F.3d 375, 383 (3d Cir. 2004) (citing *Bednar v. Marino*, 646 A.2d 573, 577 (Pa. Super. 1994) (tortious interference); *Toy v. Metro. Life Ins. Co.*, 863 A.2d 1, 9 (Pa. Super. 2004), *aff'd*, 928 A.2d 186 (Pa. 2007) (negligent misrepresentation). "The statute of limitations begins to run when the underlying cause of action accrues." *Id.*

Both of Universal's tort claims arose more than two years before it filed its claim. Universal's claim for intentional interference contract is that Honeywell knew that Universal's clients would abandon their contracts if Honeywell could not develop the new RAVEN technology to work on MaxPro. Universal's claim for negligent misrepresentation is that

16

Honeywell represented that it would perform under the Integration Agreement. Both of these tort claims turn on Honeywell's repudiation of its obligations under the alleged Integration Agreement. Thus, both of Universal's tort claims began to accrue when Honeywell first repudiated those obligations. According to the Complaint, Honeywell allegedly told Universal that it was "unwilling to fulfill its obligations under the Integration Agreement" on September 22, 2014. Therefore, Universal had until September 22, 2016 to file suit. Universal did not file suit until October 18, 2017, more than three years after its tort claims accrued.[6]

Therefore, Plaintiff's claims of intentional interference with contract and negligent misrepresentation will be dismissed.

A separate order follows.

                                        **BY THE COURT:**

                                        /s/Wendy Beetlestone, J.

                                        _____

                                        **WENDY BEETLESTONE, J.**

**April 12, 2018**

---

[6] Plaintiff makes a passing reference to applying New York law, which has a three year statute of limitations for tort claims. Application of New York law would be unavailing because Plaintiff's tort claims would still be untimely.