IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNIVERSAL ATLANTIC SYSTEMS, | Case No. 17-4660 |
| Plaintiff, | |
| v. | |
| HONEYWELL INTERNATIONAL INC., | |
| Defendant. | |

**[PROPOSED] ORDER**

**AND NOW**, this _____ day of _____, 2019, upon consideration of Defendant and Counterclaimant Honeywell International Inc.'s ("Honeywell") Motion to Exclude Testimony of Stephen Scherf Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.* **IT IS HEREBY ORDERED** that Defendant Honeywell's Motion to Exclude Testimony of Stephen Scherf Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, is **GRANTED.**

**BY THE COURT:**

_____
**WENDY BEETLESTONE, J.**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNIVERSAL ATLANTIC SYSTEMS, | Case No. 17-4660 |
| Plaintiff, | |
| v. | |
| HONEYWELL INTERNATIONAL INC., | |
| Defendant. | |

**DEFENDANT HONEYWELL INTERNATIONAL INC.'S
MOTION TO EXCLUDE THE EXPERT TESTIMONY OF STEPHEN SCHERF**

Defendant Honeywell International Inc. ("Honeywell"), by and through its attorneys, respectfully moves to exclude the expert testimony of Stephen Scherf, proffered in this case by Plaintiff Universal Atlantic Systems, Inc., for the reasons more fully stated in the attached memorandum of law, which is incorporated here by reference.

**WHEREFORE**, Defendant Honeywell International Inc. respectfully requests the Court enter an order precluding Stephen Scherf from testifying at any trial of this matter.

Honeywell respectfully requests oral argument on this motion.

Dated: February 8, 2019

**MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN**

KEVIN E. HEXSTALL, ESQUIRE
Attorney ID. No. 81248
kehexstall@mdwcg.com
2000 Market Street
Suite 2300
Philadelphia, PA 19103
215-575-2600
215-575-0856

and

**GREENE ESPEL PLLP**

s/ Mark L. Johnson
Mark L. Johnson, Reg. No. 0345520,
    *pro hac vice*
Holley C. Horrell, Reg. No. 0399636,
    *pro hac vice*
Anna M. Tobin, Reg. No. No. 395706,
    *pro hac vice*
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
mjohnson@greeneespel.com
hhorrell@greeneespel.com
atobin@greeneespel.com
(612) 373-0830

Attorneys for Defendant, Honeywell International Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNIVERSAL ATLANTIC SYSTEMS,                    Case No. 17-4660

                          Plaintiff,

v.

HONEYWELL INTERNATIONAL INC.,

                         Defendant.

**DEFENDANT HONEYWELL INTERNATIONAL INC.'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE THE EXPERT
TESTIMONY OF STEPHEN SCHERF**

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

I.   SCHERF IS NOT QUALIFIED TO OFFER OPINIONS BEYOND HIS ACCOUNTING
     EXPERTISE. ............................................................................................................... 2

II.  SCHERF'S METHODOLOGY IN CALCULATING DAMAGES FROM THE LOSS OF
     EXISTING UAS CUSTOMERS IS FATALLY FLAWED. ................................... 5

     A. Scherf's Methodology for Determining the Average Life of a UAS Customer Is
        Unsound, and This Is the Linchpin of This Part of His Damages Model. ....................... 5
     B. Scherf's Methodology Fails to Identify Profits or Revenues That Were Lost Because of
        Honeywell's Alleged Breach, As Opposed to Other Factors. ........................................ 10
     C. Discrepancies in Scherf's Data Make His Opinion Unreliable. ..................................... 15
     D. Scherf Has No Defensible Methodology to Support His Expense Deductions. .............. 17

III. SCHERF'S METHODOLOGY IN CALCULATING DAMAGES FROM THE LOSS OF
     NEW, POTENTIAL UAS CUSTOMERS IS FATALLY FLAWED. ................................ 19

IV.  SCHERF'S METHODOLOGY FOR CALCULATING RE-INVESTMENT COSTS ON
     EXISTING RAVEN ANALOG EQUIPMENT IS ALSO FLAWED. ................................ 23

     A. Scherf Has No Sound Methodology for Identifying and Calculating Replacements Cost
        Damages for past Replacements.................................................................................... 23
     B. Scherf Cannot Testify on Millions of Dollars in Future Damages "Exposure." ............. 26

V.   SCHERF'S CALCULATION OF EMPLOYEE COSTS ATTRIBUTABLE TO THE
     ALLEGED BREACH IS LIKEWISE FATALLY FLAWED. ............................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Key Corp. v. Cole Nat'l Corp.*,
762 F.2d 1569 (11th Cir. 1985) ..........................................................23

*Am. Power, LLC v. Speedoco, Inc.*,
No. 1:15-2091, 2017 WL 4084060 (M.D. Pa. Jan. 17, 2017) ................17

*Benjamin v. Peter's Farm Condo. Owners Ass'n*,
820 F.2d 640 – 43 (3d Cir. 1987)............................................................9

*Bruno v. Bozzuto's, Inc.*,
311 F.R.D. 124 (M.D. Pa. 2015)....................................................19, 30

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
350 F.3d 316 (3d Cir. 2003)....................................................................20

*Daubert v. Merrell Dow Pharm. Inc.*,
509 U.S. 579 (1993).................................................................... *passim*

*Dorman Prods., Inc. v. Paccar, Inc.*,
No. 13-6383, 2016 WL 4440322 (E.D. Pa. Oct. 17, 2016) .....................4

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000)......................................................................2

*Ferris v. Penn. Fed'n Bhd. of Maint. of Way Employees*,
153 F. Supp. 2d 736 (E.D. Pa. 2001) .....................................................20

*Fin. Cas. & Sur., Inc. v. Bonino*,
No. 11-4316, 2015 WL 6442412 (D.N.J. Oct. 22, 2015) .......................26

*Holbrook v. Lykes Bros. S. S. Co.*,
80 F.3d 777 (3d Cir. 1996).........................................................................3

*JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*,
No. 97-0652, 1998 WL 175888 (E.D. Pa. Apr. 15, 1998).......................9

*Legendary Art, LLC v. Godard*,
No. 11-0674, 2012 WL 3550040 (E.D. Pa. Aug. 17, 2012) ..................23

*Main St. Mortgage, Inc. v. Main Street Bancorp, Inc.*,
158 F. Supp. 2d 510 (E.D. Pa. 2001) .......................................................4

*Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 – 66 (S.D.N.Y. 2007)................................................................23

*McLeod v. Dollar Gen.*,
    No. 13-3113, 2014 WL 4634962 (E.D. Pa. Sept. 16, 2014)....................................23

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
    429 F.3d 1344 – 55 (Fed. Cir. 2005).......................................................................14

*Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*,
    833 F.2d 491 (3d Cir. 1987).....................................................................................13

*Out-A-Sight Pet Containment, Inc. v. Radio Sys. Corp.*,
    No. CIV.A. 01-5775, 2004 WL 1562556 (E.D. Pa. July 9, 2004)...........................10

*Rosenberg v. DVI Receivables, XIV, LLC*,
    No. 12-CV-22275, 2012 WL 12915304 (S.D. Fla. Dec. 18, 2012).........................9

*S. J. Groves & Sons Co. v. Warner Co.*,
    576 F.2d 524 (3d Cir. 1978).....................................................................................14

*Sterling v. Redevelopment Auth. of City of Philadelphia*,
    836 F. Supp. 2d 251 (E.D. Pa. 2011), *aff'd,* 511 F. App'x 225 (3d Cir. 2013) .......................9

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999)................................................................................2, 20

*U.S. Bank, Nat'l Assoc. v. Rosenberg*,
    No. 12-723, 2014WL 12772053 (E.D. Pa. Sept. 2, 2014) ......................................2

*United States v. City of Miami*,
    115 F.3d 870 (11th Cir. 1997) ................................................................................17

*Ware v. Rodale Press, Inc.*,
    322 F.3d 218 (3d Cir. 2003).....................................................................................27

*ZF Meritor LLC v. Eaton Corp.*,
    646 F. Supp. 2d 663 (D. Del. 2009), *aff'd,* 696 F.3d 254 (3d Cir. 2012) ................8

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)..................................................................................1, 9

**Rules**

Fed. R. Civ. P. 26(a)(2)(A) .............................................................................................22

Federal Rule of Evidence 702.................................................................................1, 2, 3

Rule 703 ..........................................................................................................................23

**Other Authorities**

██████████████████████████████ ..................................................12

████████████████████████████████████████

██ ..............................................................................................12

UAS seeks to present purported expert testimony from Stephen Scherf, who would opine that Honeywell's alleged breach caused more than $16 million in damages to UAS. Scherf calculates these purported damages in four separate buckets: (1) identified UAS customers lost because of Honeywell, (2) potential new customer opportunities missed because of Honeywell, (3) costs of UAS equipment that has been or may have to be replaced because of Honeywell, and (4) employee expenses incurred because of Honeywell. Scherf does not reach his conclusions based upon any experience or expertise in the relevant industry. Indeed, he has none. Nor does he reach his conclusions by subjecting the evidence in this case to any sort of methodologically-sound review and analysis. Instead, he gets there through a mix of blind faith in anything UAS management tells him, a presumption Honeywell caused all bad things after September 2014, and basic arithmetic. As demonstrated below, the assumptions and methodologies that undergird Scherf's approach to all of these categories of supposed damages are fatally flawed, rendering his opinions entirely unreliable. His testimony would not be helpful to the finder of fact. It must be excluded in its entirety under *Daubert* and its progeny.

## ARGUMENT

When considering expert testimony, the Court acts "as a gatekeeper to ensure that the expert's opinion is based on the methods and procedures of science rather than on subjective belief and unsupported speculation." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012) (internal quotation marks omitted). Federal Rule of Evidence 702 governs the admissibility of expert testimony, allowing such testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of

reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

Courts interpret Rule 702 to "embod[y] three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). The proponent of the expert evidence must show that these factors are satisfied by a preponderance of the evidence. *See In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999). In sum, "[a]n expert must demonstrate that he has good grounds for the opinion (*i.e.*, the opinion is based on methods and procedures of science, not subjective belief) and a reasonable degree of certainty regarding the opinion." *U.S. Bank, Nat'l Assoc. v. Rosenberg*, No. 12-723, 2014 WL 12772053 (E.D. Pa. Sept. 2, 2014) (*citing Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 590 (1993)). UAS cannot meet its burden.

## I.   SCHERF IS NOT QUALIFIED TO OFFER OPINIONS BEYOND HIS ACCOUNTING EXPERTISE.

Scherf seeks to offer a multitude of opinions on causation, the qualities of certain video surveillance hardware and software, and the market for video surveillance equipment and services. For example, he would opine that the assumed breach left UAS with "a compromised analog product" and no IP Video product to offer to existing customers "that wished to switch to IP Video" or who "were opening new facilities" and wanted "to have analog alongside digital, both managed by a single platform." Ex. A (hereinafter Scherf Rep.) at 9. All of this, he says, *caused* "an increase in the attrition rate of existing customers." *Id.*; *see also* Ex. B (hereinafter Scherf Tr.) at 40 – 41 ("Q. Did you assume that the breach led to the loss of customers or do you have a professional opinion, based on experience or training, that the breach led to the loss of customers?" "A. *I have an opinion* that the breach led to the loss of customers based on my analysis."). Scherf would further opine that the assumed breach created a negative market reality for UAS and that "it is

2

reasonable to expect that this harm will have an additional negative impact (increase) on customer attrition." Scherf Rep. at 16. He would opine that "[o]nly Honeywell could integrate their Raven analog and proposed IP product," and that the "assumed breach caused UAS to become a 'follower' in the Video IP space . . . rather than remain an 'innovator' and a market leader." *Id.* at 16 – 17. He would opine that if Honeywell had delivered a Raven IP product, then UAS "would have had a future proofed offering and therefore would have maintained its market leader status in the video services space within the industry." *Id.* at 17.

Scherf has no expertise that qualifies him to offer *any* of these opinions. He is an accountant. *See id.* at App. A (Resume). In his life, he has had "less than a half a dozen" clients in the security alarm or video surveillance industry—none of whom he can recall by name. Scherf Tr. at 8 – 10. He has no expertise on video surveillance technology, video monitoring systems, or video reporting systems, and no prior training or professional experience in marketing to the monitoring and security industry. *Id.* at 15 – 16, 38 – 39. Before this case, the only time he had even *seen* a video surveillance DVR or NVR was when he provided professional services to tanning salons that had such equipment. *Id.* at 19. He does not know the differences between an analog video surveillance system and an IP video surveillance system, or why a customer might choose one over the other. *Id.* at 16 – 17. He has never, prior to this case, attempted to ascertain the reasons why a customer might leave a vendor in this industry. *Id.* at 14. Nor is he a "software development person." *Id.* at 14 – 15.

An expert must, at a minimum, possess "knowledge, skill, experience, training, or education" in the area on which the expert seeks to opine. Fed. R. Evid. 702. While the Third Circuit employs a "liberal approach to admitting expert testimony," *Holbrook v. Lykes Bros. S. S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996), this does not give carte blanche for an expert to testify to

3

anything he or she may wish to, which would deplete the very meaning of expert testimony. In *Main St. Mortgage, Inc. v. Main Street Bancorp, Inc.*, 158 F. Supp. 2d 510 (E.D. Pa. 2001), the defendant moved to exclude expert testimony on damages by a CPA who—like Scherf—had no experience in the relevant industry. Although the Court declined to exclude the expert based on the concession that no such opinion was being offered in that case, it made clear that such an expert would not have been allowed to opine on *causation*: "Were he being offered as an expert as to the inner workings of the mortgage industry, we might conclude that he lacked the proper qualifications. However, as Plaintiff's counsel articulated at Oral Argument, [the expert] is not testifying as a trademark expert or *saying that the decline in Plaintiff's business is attributable to the Defendant's allegedly infringing conduct*." *Id.* at 513 (emphasis added).

Scherf is doing exactly what the *Main Street Mortgage* court cautioned against. In contrast to quantifying the alleged financial impact of a purported increase in UAS's customer attrition, Scherf offers opinions on *why video surveillance customers terminate* in the first place and *why potential customers might avoid UAS's technology*. Courts routinely exclude experts whose opinions stray outside their domain. *See e.g., Dorman Prods., Inc. v. Paccar, Inc.*, No. 13-6383, 2016 WL 4440322, at *14–16 (E.D. Pa. Oct. 17, 2016) (expert with general expertise in design, but no experience in headlight design, could not testify to validity of headlight patent). Because he has no experience, training, or skill in the video surveillance and security industry, Scherf cannot opine on causation, the effects of the alleged breach, the impediments to UAS's growth in the industry, the purported problems with the Honeywell Raven analog system, or anything else outside his accounting expertise (to the extent he is permitted to testify at all).

## II.   SCHERF'S METHODOLOGY IN CALCULATING DAMAGES FROM THE LOSS OF EXISTING UAS CUSTOMERS IS FATALLY FLAWED.

### A.   Scherf's Methodology for Determining the Average Life of a UAS Customer Is Unsound, and This Is the Linchpin of This Part of His Damages Model.

The heart of Scherf's damages opinion is the statement that "the average UAS customer renews at least once and typically remains a customer for more than 10 years . . ." *See* Scherf Rep. at 9. Scherf translates this into an opinion that *every* UAS customer would stay with UAS for a "Life of Customer" of 120 months. He uses this as a proxy for causation: If a customer terminated *after* the alleged breach on September 22, 2014, but *before* completing its fictional ten-year tenure, then that customer is a source of money damages. *See id.* at Ex. 2. And he uses the 120-month Life of Customer to calculate the damages: If a ███████████ customer terminated after the alleged breach, and after being a customer for twelve months, then Scherf opines that this customer would have stayed another 108 months, paying ████ per month for a total of ██████. Scherf then takes certain across-the-board deductions (discussed below) to get to damages. If Scherf had used a shorter Life of Customer, it would have eliminated customers from his list and reduced the damages attributed to each remaining customer. Scherf Tr. at 100 – 102. Through this simplistic methodology, Scherf identifies more than ████ specific UAS customers whose departures purportedly caused more than $10.3 million in damages to UAS. *See* Scherf Rep. at Ex. 2.

Given the centrality of the 120-month Life of Customer, one might have expected Scherf to have been rigorously tested and methodologically supported this part of his opinion. But Scherf did *nothing* to calculate the average life of a UAS customer using any data set provided by UAS. Scherf Tr. at 96 – 97. He did not even seek information that would have *allowed* him to calculate the average life of a UAS customer. *Id.* at 99. He did not try to determine whether a given type of customer might have a different expected life from that of other customers. He did not, for example, attempt to determine whether a corporate ████████████ restaurant might

typically stay with UAS longer than a mom-and-pop deli. *Id.* at 120 – 121. He did not consider whether the customer's industry, market conditions, or pricing might affect the expected life of a UAS customer. *Id.* at 121.

Instead, the *sole* source for Scherf's ten-year number is "Discussions with [UAS VP of Marketing] Christopher McGurk and [President] Scott Elkins." Scherf Rep. at 9 n.19; *see also* Scherf Tr. at 74 ("the ten years was based upon discussions with Mr. McGurk and Mr. Elkins, as well as consistent with my analysis of data that I saw that was produced to me."). Asked what data (if any) he had considered to corroborate their claims as to the average life of a UAS customer, Scherf identified a spreadsheet provided to him by UAS, which purports to identify the start date of every UAS video customer that came onboard in or after 1999 and the termination date of every UAS video customer from 1999 to mid-2018. *See* Ex. C (Dep. Ex. 409). That spreadsheet lists almost ████ UAS Raven customers that terminated between 1999 and June 2018. Fewer than ████ of those customers are reported to have stayed with UAS for ten years or more. *See id.* The mean life of all video customers identified on that spreadsheet calculates to less than *six* years. *See id.* Far from corroborating the 120-month Life of Customer, then, the spreadsheet on which Scherf relied seems to contradict it.

Given this, Honeywell asked what methodology Scherf used to confirm the 120-month Life of Customer using this spreadsheet. Scherf explained that he had manipulated Deposition Exhibit 409 by filtering to look only at UAS's Raven video customers. *See* Scherf Tr. at 81. He saw that "there were a bunch of them that were over ten years." *Id.* at 82. He could not recall whether a *majority* of the customers had stayed more than ten years (which, of course, is not the case), but he saw "[e]nough for me to get comfortable that a ten-year assumption was appropriate."

*Id.* at 82. Pressed on how many of the customers would need to have stayed for him to be "comfortable" with this opinion, he responded as follows:

> Look, I don't have the data to answer that question. My data that I ultimately worked with to come up with damages was a paired down sort. So, once I did that sort, got comfortable with the ten year life, I then condensed that in my Excel spread sheet and, you know, left it there *but didn't analyze it*. So, because those were customers that were there for longer than ten years. So, I, you know, felt comfortable that the ten-year assumption was an appropriate assumption based on that analysis.

*Id.* at 82 – 83 (emphasis added)*; see also id.* at 92 – 93. UAS and Scherf have not produced the manipulated version of the data that Scherf used to "get comfortable" with his 120-month Life of Customer opinion. *Id.*

When asked whether he felt it reasonable to use a ten-year life for *all* UAS customers, given that the data on which he himself relied seem to show that only small minority of terminated customers stayed that long, Scherf argued that the data were flawed. That spreadsheet identifies only *lost customers*, which Scherf said could lower the apparent average life because current customers would not be listed. *Id.* at 94 – 95. In addition, the spreadsheet on which he relied starts at 1999, which might artificially cut short the apparent lives of older UAS customers. *Id.* at 74 – 75. Whatever the shortcomings of Deposition Exhibit 409, that document is *the only set of data* that Scherf used to "get comfortable" with the claim of UAS management that UAS customers stay for 10 years. He sought and reviewed *nothing else. Id.* at 99.

This points to the core flaw in Scherf's methodology—a flaw that is repeated throughout his report. Scherf takes whatever factual claims are presented to him by UAS management, gets subjectively "comfortable" with them through some undisclosed methodology, and then adopts them as his *opinions*—regardless of any contrary evidence. *Id.* at 95 – 96. Scherf described this methodology succinctly at his deposition:

Q. So, the two people at UAS you talked about are per your foot note, 19, Mr. McGurk and Mr. Elkins about this issue?

A. Correct.

Q. They each told you the average life is ten years or more?

A. They told me it was in excess of ten years.

Q. But just to be clear, you became comfortable that that was accurate based on your review of this - - of UAS RMR by quarter, the spread sheet we've been looking at, 409?

A. Right. Recognizing what that data represents, yes.

Q. And you didn't look at any other data to verify that?

A: No, I didn't have that data. That data wasn't produced in litigation.

Q. Did you ask for it from UAS?

A. No. I didn't think I needed to.

*Id.* at 98 – 99 (objection omitted). As a result, the *only* apparent methodological foundation for Scherf's opinion that the average UAS customer stays for ten years is the word of UAS executives and a spreadsheet that—however flawed—seems to show something very different.

An expert cannot base an opinion on whatever a party tells him to assume or believe. Rather, the expert has an obligation to ensure that the opinion is based in facts and corroborated through some reliable methodology. For example, in *ZF Meritor LLC v. Eaton Corp.*, 646 F. Supp. 2d 663, 667 (D. Del. 2009), *aff'd*, 696 F.3d 254 (3d Cir. 2012), the plaintiff's expert based a damages opinion on a profit-and-loss projection that had been prepared by the plaintiff itself. The court excluded the opinion because it was based on information that the plaintiff provided, and that the expert simply took for granted without deeper analysis:

> Although the court does not disagree with the general proposition that an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities

. . . Dr. DeRamus did not construct his own world. He did not use actual financial data in order to project the 2000 estimates. He did not apply his own assumptions, based upon his expertise, to any financial data in order to project the 2000 estimates. In short, Dr. DeRamus relied on the 2000 estimates without knowing either the qualifications of those who actually prepared them or the validity of the underlying data and assumptions upon which the 2000 estimates were based.

*ZF Meritor*, 646 F. Supp. at 667; *see also Sterling v. Redevelopment Auth. of City of Philadelphia*, 836 F. Supp. 2d 251, 272–73 (E.D. Pa. 2011), *aff'd*, 511 F. App'x 225 (3d Cir. 2013) (excluding a CPA's opinion on economic losses resulting from a property dispute where the expert relied solely on the plaintiff's own projections without independently investigating their reasonableness); *Benjamin v. Peter's Farm Condo. Owners Ass'n*, 820 F.2d 640, 642 – 43 (3d Cir. 1987) (excluding expert testimony on earnings losses based solely on the plaintiff's "personal belief" as to his earnings potential). Where an "expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury," the opinion must be excluded. *Sterling*, 836 F. Supp. 2d at 272; *see also JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*, No. 97-0652, 1998 WL 175888, at *6 (E.D. Pa. Apr. 15, 1998) (expert's opinion "must have some connection to existing facts" and "expert testimony that ignores existing data and is based on speculation is inadmissible.").

Scherf should be aware of all of this. In *Rosenberg v. DVI Receivables, XIV, LLC*, No. 12-CV-22275, 2012 WL 12915304, at *2 (S.D. Fla. Dec. 18, 2012), *Scherf himself* was precluded from testifying that a plaintiff's loss of income, drop in credit scores, loss of reputation, and loss of business opportunities were attributable to the alleged wrongdoing in that case. There, "Scherf fail[ed] to articulate the methodology relied upon, or any facts or analysis at all, to support his conclusion that Plaintiff would have earned $1,113,125 in income but for" the wrongdoing alleged in that case. *Id.* The only information Scherf obtained to support his views on these matters was "conversations with Plaintiff and his wife." *Id.* As a result, "Scherf did not engage in the type of independent analysis required under *Daubert*" so his testimony was excluded. *Id.*

9

In another case, Scherf served as an expert for the plaintiff, a defunct manufacturer of electronic dog fence systems. *See Out-A-Sight Pet Containment, Inc. v. Radio Sys. Corp.*, No. CIV.A. 01-5775, 2004 WL 1562556, at *1 (E.D. Pa. July 9, 2004). Scherf initially opined that the company would have experienced year-over-year sales growth of 47%, but for the defendant's actions. *Id.* The sole basis for that number was the plaintiff's own projections, which Scherf had failed to corroborate using any reliable methodology. *Id.* The court found Scherf's opinion unreliable, but it allowed Scherf to submit a revised expert report. *Id.* In his revised report, Scherf continued to use his 47% number, now supported by the testimony of a single witness who had suggested growth rates as high as 50% to 100% per year. *Id.* *2. Again, Scherf used no methodologically sound approach to verify that these figures were applicable. *See id.* He had not, for example, accounted for the fact that such past growth rates might have been driven by unique circumstances that were unlikely to be repeated. *Id.* For these reasons, the court found "an absence of 'good grounds on which to find the data reliable,'" and it excluded Scherf's opinions. *Id.* at *3 (quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 748–49 (3d Cir. 1994)).

Scherf's opinion that UAS customers stay for 120 months fares no better. It is based entirely on conversations with UAS management, untested by any reliable methodology and uncorroborated by independent evidence. Scherf's 120-month opinion, and the damages model he builds upon it, must be excluded.

### B. Scherf's Methodology Fails to Identify Profits or Revenues That Were Lost *Because of Honeywell's Alleged Breach*, As Opposed to Other Factors.

Based entirely on his 120-month Life of Customer opinion, Scherf identifies a list of more than ███ former UAS customers who he opines are sources of money damages resulting from Honeywell's alleged breach. His list includes *every* customer lost after the alleged breach (unless it had already been with UAS for ten years or more)—*regardless of why they left*. Scherf Tr. at 48

10

– 49. Scherf assumes a ▮ annual rate of customer attrition that would occur regardless of anything Honeywell did or failed to do.[1] *Id*. at 51. Based on this ▮ figure, Scherf admitted that about ▮ of UAS's ▮ customers would be expected to terminate each year—regardless of the alleged breach. *Id*. at 57 – 59. Scherf would therefore have expected somewhere between ▮ UAS customers—▮—to have terminated since the alleged breach in 2014 *regardless of anything Honeywell did or failed to do. Id*. at 61.

Scherf made no effort to identify and remove customers from his damages list that departed in the ordinary course (for example, because the customer went out of business or was sold). *Id*. at 104 – 105 ("Q. So, just to be crystal clear, you don't know why that ▮ store left? A. I do not."). He made no effort to find out if there were unusual spikes in attrition driven by factors unrelated to Honeywell. *See id*. at 46 – 47. Why? Because UAS's senior executives told him there were no reliable data that could be used to identify and exclude those customers. *Id*. at 49 ("Q. Did you ask UAS for whatever data they had on why customers - - specific customers had left? A. They didn't have reliable data was what I understood based on my conversations."); *see also id.* at 150 – 151. Rather than seeking information and testing his opinions using his training as a CPA, Scherf again accepted the representations of UAS management.

In reality, UAS has produced *numerous* documents that speak to the reasons why specific customers terminated in the years after the breach. For example, UAS's CFO created a quarterly report for submission to a security industry group containing information about UAS customer attrition. Ex. D (Dep. Ex. 49); Ex. E (Christie Tr.) at 124 – 125; Ex. F (Tartar Tr.) at 100. While

---

[1] Scherf acknowledges that UAS had been losing *more than* ▮ of its customers in each of the three years leading up to the alleged breach ▮. *See* Scherf Rep. at Ex. 3. Scherf does not defend his presumed ▮ attrition rate except to say it is an average of several prior years. This unjustifiably generous to UAS, which is another fatal flaw in Scherf's opinion.

UAS has disclaimed the accuracy of these reports, *see, e.g.,* Ex. E (Christie Tr.) at 125 – 126, they suggest that the most significant drivers of attrition were customers going out of business or moving. *See* Ex. D (Dep. Ex. 49) at Data Tab under "Loss." In addition, UAS's bankers inquired in 2016 about the spike in UAS's attrition rate. In response, UAS explained that the increased attrition resulted from (1) the acquisition of a major customer by a new owner that took its security monitoring in-house, and (2) the sale of hundreds of corporate-owned ██████ stores. Ex. E (Christie Tr.) at 144 – 147; Ex. G (Dep. Ex. 53). UAS made no mention of Honeywell. *Id.* UAS also produced documents in which its own customer service representatives recorded specific reasons for customer terminations that occurred after the alleged breach. *See, e.g.,* Ex. H (Dep. Ex. 260). Scherf considered none of these. *See* Scherf Rep. at App. B (Documents Considered).

Nor did Scherf conduct any independent analysis to confirm that it was appropriate to treat all ██████ customers on his list as having left because of Honeywell. Scherf Tr. at 49 – 50. He conducted no research into the industries UAS serves or into specific UAS customers to try to determine whether customers might have terminated for reasons unrelated to Honeywell *Id.* at 45, 47 – 48. Scherf blames Honeywell for the loss of nearly ██████████ accounts since late 2014, accounting for almost ██████ of the alleged damages reported on Scherf's Exhibit 2. But Scherf did not so much as conduct a Google search ██████████████ to see if the reported increase in ██████ attrition might be explained by factors independent of Honeywell. *Id.* at 46 – 48. Had he done so, he might have found news reports that *thousands* of ██████ restaurants closed from 2015 to 2018.[2] At a minimum, this would warrant further

---

[2]  *See,  e.g.,* ██████████████████████  and ██████████████████████████.

study to determine whether the nearly ███ ████████ terminations identified by Scherf are appropriately viewed as sources of damages from Honeywell's alleged breach.

Instead of digging into any of this, Scherf again used a methodologically and legally untenable shortcut. He first assumed (as discussed above) that *all* UAS customers stay 120 months. If a customer had been with UAS for 18.95 months, Scherf calculated that it would have stayed another 101.05 months but for the breach. Scherf multiplied that 101.05 times the monthly fee it had paid UAS for service. Scherf at 108–110. Rather than removing any customer from his list to account for non-Honeywell-related terminations, Scherf then attempted to account for unrelated attrition by performing the following arithmetic on the revenues anticipated from each customer:



> And then I calculate that out and I say okay, there's - - for the first year there's a ██ percent attrition rate. The second year there's another ██ percent attrition rate. The third year there's another ██ percent attrition rate, the fourth year there's another ██ percent attrition rate, all the way through to get to how many years are in 101 months. So, you, you know, so every year, the ██ gets hit by another ██ percent attrition. So, in round terms, as we're describing it, the ██ in the first year is ██ times ██. In the second year, it's ██ times . ██ times ██, et cetera, et cetera.

Scherf Tr. at 110 − 111. Scherf thus pretends that all ███ customers on his list would have stayed a full ten years, but for the alleged breach, and that they would have simply paid ██ less for their UAS services each year. *Id*. at 113 − 114.

This makes absolutely no sense. Scherf himself admits that customers who terminate *disappear and stop paying altogether*. *Id*. at 114. They do not stick around for ten years paying ██ less each year. As a result, the only methodologically and legally sound way to determine UAS's damages from identified customer terminations would be to identify the customers who terminated because of the alleged breach of contract. *See Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*, 833 F.2d 491, 496 (3d Cir. 1987) (confirming under Pennsylvania law that damages sought must be a "proximate consequence of the breach" and experienced losses need to

13

"be allocated between those caused by the defendant's breach and those not"); *S. J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 527 (3d Cir. 1978) ("if the loss caused by a breach cannot be isolated from that attributable to other factors, no damages may be awarded"); *see also MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1354 – 55 (Fed. Cir. 2005) (approving exclusion of damages expert who ignored other factors that may have contributed to plaintiff's losses and attributed them all to defendants' actions). Scherf did not even attempt to do this.

Scherf's approach is also absurd because it fails to account for the fact that some of the customers who purportedly terminated later *returned* and are again paying UAS monthly fees. For example, Scherf identifies more than ███████████ restaurants that purportedly terminated after the alleged breach in late 2014, leading to more than █████ in alleged damages. *See* Scherf Rep. at Exhibit 2. But Scherf admitted at his deposition that these ██████████ locations subsequently renewed their accounts with UAS and are again paying monthly fees. Scherf Tr. at 134 – 135. Scherf does not know whether other customers on his list that have similarly returned to UAS. *Id.* at 139. But Scherf did nothing in his Exhibit 2 to account for this; instead, he expects that other calculations elsewhere in his report would somehow "offset" this by treating these returning customers as new customers. *Id.* at 138 – 139.

Thus, far from quantifying *damages* flowing from Honeywell's alleged breach, Scherf has simply developed a list of UAS customers that may or may not have left because of Honeywell, and that may or may not have subsequently returned to UAS. He then performed some questionable arithmetic to transform these purported terminations into a $10.3 million damages number. Nothing about this approach can lead to a remotely reliable answer to the question—what money did UAS lose because of Honeywell's alleged breach? This part of Scherf's opinion must be excluded.

14

## C.     Discrepancies in Scherf's Data Make His Opinion Unreliable.

Even if Scherf's methodology were sound, and it is not, the data he uses to arrive at his opinion on damages due to lost customers are not reliable. Part of Scherf's report relies on a spreadsheet entitled "Honeywell Raven Units Purchased from 2010-2014," which identifies every "Raven" unit installed from mid-2008 to mid-2018 and the associated costs and revenues. *See* Ex. I (Dep. Ex. 281). Cross referencing that spreadsheet against Scherf's Exhibit 2 reveals that *hundreds* of the customers that Scherf treats as sources of damages are duplicative or otherwise erroneous. For example:

- Scherf's Exhibit 2 identifies more than ███████ restaurants that UAS installed after June 2008 and that terminated after the alleged breach, accounting for more than █ ███ of his purported damages. But Deposition Exhibit 281 identifies fewer than ███ ██████ *restaurants total* that UAS installed after June 2008 and that ceased generating revenue by 2018. It is unclear where Scherf found the extra ████ restaurants.

- Scherf's Exhibit 2 identifies ██████ restaurant locations that were installed between 2010 and terminated by April 2018, causing over ███████ in purported damages to UAS. But Deposition Exhibit 281 identifies only ██████ locations installed from 2010 to June 2018. More than ███ of those were still generating revenue as of June 2018, meaning UAS lost only about ████████████, not ███.

- Scherf's Exhibit 2 identifies ████████ restaurants that supposedly became UAS customers in January 2015 and terminated in January 2016, leading to more than █████ in purported damages. But according to Deposition Exhibit 281, only █████████ restaurants came online in January 2015 and terminated in January 2016.

These are just a few of *many* examples, but they suggest there are numerous bogus entries on Scherf's Exhibit 2 that have the effect of dramatically increasing the purported damages.

In addition, Scherf (appropriately) purports to limit his damages analysis and opinions to customers that used Honeywell machines. Scherf Rep. at 10 ("The damages calculation in this category is limited to the specific UAS Honeywell video business as that business is the subject of the dispute."). But cross referencing Scherf's Exhibit 2 against Deposition Exhibit 281 reveals hundreds of instances where Scherf has charged damages against Honeywell for customers that used non-Honeywell equipment. For example:

- According to Deposition Exhibit 281, UAS installed Raven systems at about ███████ ████ sites from 2008 to 2018. Of these, only ███ were Honeywell machines. Scherf's Exhibit 2 identifies ████████████ sites that purportedly terminated, leading to damages he opines were caused by Honeywell.

- Deposition Exhibit 281 shows that UAS installed Raven systems at about ███████ Restaurants from 2008 to 2018, *all* of which were supplied by OzVision or OpenEye. Yet Scherf's Exhibit 2 identifies multiple ████████ locations that terminated leading to damages he attributes to Honeywell.

- Deposition Exhibit 281 shows that UAS installed Raven systems at about ████████ Restaurants from 2008 to 2018. It shows that, with the exception of a single machine installed in 2010, *all* of these ██████ locations used Ozvision or OpenEye equipment. Scherf's Exhibit 2 identifies ████ █████ locations—all installed in 2012—that terminated leading to damages he attributes to Honeywell.

There are many other instances where Scherf is apparently charging damages to Honeywell related to customers that—according to Exhibit 281—used competing equipment.

16

These and other irregularities may explain a much larger discrepancy between Scherf's opinions and reality. According to Scherf, the alleged breach caused UAS to lose almost ██████ in monthly revenue from the end of 2014 to the end of 2018. *See* Scherf Rep. at Ex. 2. During this same period, UAS's monthly recurring revenue from its Raven video business actually *grew* by almost ████—from roughly ██████ per month at the end of 2014 to almost ██████ per month at the end of 2018. *See* Ex. J (Scherf Rebuttal Report) at Ex. A.

*Daubert* recognized numerous factors relevant to the reliability of an expert opinion, including error rate. *See Daubert*, 509 U.S. at 593 – 94. Where "an expert's testimony fails to meet threshold reliability standards" because it "relies upon inaccurate or unverifiable data . . ., striking expert evidence due to its reliance on questionable data is not a novel course of action among Pennsylvania federal courts." *Am. Power, LLC v. Speedoco, Inc.*, No. 1:15-2091, 2017 WL 4084060, at *8 (M.D. Pa. Jan. 17, 2017); *see also United States v. City of Miami*, 115 F.3d 870, 873 (11th Cir. 1997) ("opinions derived from erroneous data are appropriately excluded"). There can be no ambiguity surrounding the potential for error here. Scherf relies for his opinions on two sets of UAS business records that are riddled with inconsistencies. Scherf made no attempt to cross-reference the documents or to resolve these discrepancies. Why? That "would have taken a bunch of time to re-sort and reconfigure the data to make it comparable." Scherf Tr. 163 – 164. Under *Daubert*, that is not good enough.

   **D.    Scherf Has No Defensible Methodology to Support His Expense Deductions.**

After opining that UAS lost more than ████ million in revenues due to the alleged breach, Scherf reduced that figure by ████ to get to his final damages number in the "lost customers" category. While his calculations have not been provided, this apparently represents the salary and benefits at ████ per year for one staffer to have joined UAS every six months starting in January 2015 (three months after the alleged breach). Scherf Rep. at 11 & Scherf Rep. Ex. 2 (final page).

17

Scherf deducts this to account for the incremental costs of labor that would have been necessary for UAS to support all of these customers, had they not been lost due to the alleged breach.

It is certainly appropriate to deduct the incremental expenses that would have been necessary for UAS to service the customers that Scherf presumes were lost due to the alleged breach. But, again, Scherf's methodology was simply to ask UAS management how much to subtract to account for incremental costs. To get "comfortable" with the numbers UAS provided, Scherf walked around UAS's offices and considered his own "knowledge of cost structures." *See* Scherf Tr. at 185 – 186; *see also id.* at 123 – 125. Asked whether this ████ deduction represents "an assumption" or part of his "opinion," Scherf made clear it is the latter: "I call it a determination of the proper incremental costs for the loss of those revenues." *Id.* at 126 – 127.

Had Scherf's conducted an independent review and analysis of UAS business records, and had such analysis revealed that it would have cost *more* for UAS to service this volume of "lost customers," then this category of damages would have been correspondingly reduced. But Scherf did no such analysis. When asked if he performed analysis that "supports the idea that adding a person every six months would have been the right amount," or whether instead "you took that from UAS and it sounded right," Scherf responded, "I'm going to say I think that I took that from UAS based upon my review and looking at the central station, that that seemed about right for these number of customers." *Id.* at 131. But Scherf had never been to a security monitoring company's central station before, *id.*, and he has no prior experience determining what level of staffing is necessary for a company in this industry to support a collection of video surveillance customers, *id.* at 17 – 18. Scherf did not review business records to see how much UAS *actually pays* the people who service its Raven customers to confirm that they make ████ per year instead of less or more. *Id.* at 125 – 126. Nor did he compare historical records to determine the

18

extent to which UAS's employee costs had grown in the past to accommodate similar numbers of customers. *See id.* at 128.

Scherf's methodology is thus, again, blind faith in whatever UAS's owners and senior executives tell him. "[E]xperts who use data in their reports without independently verifying the accuracy or reliability of those figures fail to satisfy this Circuit's reliability requirement. That independent verification is particularly important where, as here, the contested experts lack familiarity with the pertinent industry." *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 138 (M.D. Pa. 2015). Scherf's unquestioning acceptance of UAS executives' assumptions on incremental labor costs cannot constitute independent investigation. This further renders his opinions unreliable.

## III.  SCHERF'S METHODOLOGY IN CALCULATING DAMAGES FROM THE LOSS OF *NEW, POTENTIAL* UAS CUSTOMERS IS FATALLY FLAWED.

Scherf next calculates the purported damages from an alleged drop in the growth of *new* UAS customers since the alleged breach. To support this opinion, Scherf reviews the trend in UAS's revenue growth over a ten-year period from ████████. *See* Scherf Rep. at Ex. 3. He reports that UAS had its highest *ever* new customer growth rate in ████████. *Id.* That growth then dropped consistently to ███████████████████████. *Id.* It continued its downward trend in ████████████. *Id.* Despite this, Scherf opines that UAS's multi-year downward growth trend would have been arrested in 2014 and held steady at ████, but for the alleged breach. Scherf uses this ████ figure to calculate that, but for the alleged breach, UAS would have had about ██████ in new monthly revenues by the end of 2017.

As a preliminary matter, Scherf does not have the qualifications to opine on the marketplace for video surveillance services or the reasons why UAS's growth rates were dropping before or after the alleged breach. *See, e.g.,* Scherf Tr. at 13 – 17, 38. He does not know why UAS's growth was trending downward, and he cannot be permitted to opine that its growth would

have rebounded or held flat but for the alleged breach. *See e.g., Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003) ("An expert may be generally qualified but may lack qualifications to testify outside his area of expertise."); *Ferris v. Penn. Fed'n Bhd. of Maint. of Way Employees*, 153 F. Supp. 2d 736, 743 (E.D. Pa. 2001) ("Although an expert's testimony is not limited to the area in which he or she has specialized, the party offering the expert must demonstrate that the expert has the necessary expertise to provide reliable evidence. . . . If the expert testimony falls outside a witness's expertise, the court should exclude it.").

Regardless, once Scherf calculated that UAS lost ███████ per month in new recurring monthly revenue, one might have expected him to calculate the present value of that income stream (after accounting for attrition, the time value of money, the cost to service these new customers, and other factors). Such an approach might, if based on appropriate evidence and assumptions, have been methodologically defensible. *See e.g., In re TMI Litig.*, 193 F.3d at 677 (although the *Daubert* analysis "does not preclude testimony merely because it may be based upon an assumption, the supporting assumption must be sufficiently grounded in sound methodology and reasoning to allow the conclusion it supports to clear the reliability hurdle").

Instead, Scherf took yet another indefensible shortcut. For many years, UAS has retained an outside consultant called Barnes Associates to prepare an annual Opinion of Value of UAS. Barnes Associates reviews transactions involving the sale of security alarm companies and information about UAS, and it comes to an annual conclusion on what a willing buyer might pay for UAS—*the entire company*—expressed as a multiple of its monthly recurring revenue. *See* Ex. K (Dep. Ex. 50 (Barnes Reports from 2011 – 2017)). In its 2014 report on the sale value of UAS as of the end of 2013, Barnes Associates concluded that a willing buyer might pay a multiple of ███ UAS's recurring monthly revenue to acquire UAS's business (less deductions for debt and

other factors). *See id.* at UAS-HC-00005510. Scherf borrows that ███ multiplier from the Barnes

Associates' report on the sale value of UAS's *entire business* as of December 31, 2013, and he

multiplies it by the ████ in additional revenue he believes UAS should have had by the end

of 2017. Scherf. Rep. at 13. On this basis, Scherf would opine that UAS lost another ████

because of the alleged breach. There are numerous problems with this methodology.

First, the Barnes Associates report states that this ███ multiple is used to appraise the

*sale value of the entire company* as of 2013. There is no claim that UAS was harmed because it

attempted to sell the company and found it was worth less because of something Honeywell failed

to do. And there is nothing in Scherf's report or the Barnes Associates reports to suggest that a

████ slice of UAS's business would have the same value as the whole of its monthly recurring

revenue stream. As such, it is unclear why Barnes Associates' valuation multiple would be an

appropriate measure of damages *at all*. Scherf claims that it is "essentially an incremental value of

cash flow because values of companies are based on cash flow" and a "shortcut to cash flow."

Scherf Tr. at 202 – 204. But that is nowhere stated in the Barnes Associates reports.

Second, Scherf uses this 2013 valuation multiple as a proxy for damages in a case that

assumes breach of a contract to deliver a *future* Honeywell product line, to service *future*

customers. But the costs and features of such a system, and the characteristics of those future

customers, could not have been known to Barnes Associates when preparing their opinion of

UAS's value as of December 31, 2013. Even Scherf admits that if the costs of the future Raven IP

system were far higher than the existing Raven analog system, then this would drive down the

value of this revenue stream and affect the valuation multiple. *See id.* at 215 – 217. So how can

the Court be certain Barnes Associates took all this into account when preparing its 2013 Opinion

of Value and that this revenue multiple can now be used to calculate contract damages? "Well,

because Barnes is an expert in the securities industry and he would know what a dollar RMR would be worth, which would, on average, take into account the cost of to buy the equipment and all the other costs associated." *Id.* at 215 – 216. But that future IP equipment and its pricing did not exist and were not known to Barnes Associates when preparing their 2013 valuation report.

This points to the third and perhaps most significant flaw in this part of Scherf's opinion. It was Barnes Associates, not Scherf, that came up with the ███ valuation multiple in the exercise of *its* judgment, on the basis of *its* professional experience, the information available to *it* in 2014, and *its* knowledge of transactions in the security industry—all for a purpose *other* than opining on contract damages. *See* Ex. K (Dep. Ex. 50) at UAS-HC-00005510. While Scherf claims to have talked to Mr. Barnes and "got comfortable that that was an appropriate number for me to use," Scherf Tr. at 208, his report discloses no attempt by Scherf himself to validate this figure using his own professional judgment.

Barnes Associates has not been disclosed or subjected to the rigors of expert discovery in this litigation. As a result, whatever their reputations, its people cannot offer expert testimony at any trial, Fed. R. Civ. P. 26(a)(2)(A), and they cannot provide the necessary foundation for Scherf's application of the ███ valuation multiple to a ███ slice of UAS's supposedly lost business opportunities. Nor can Scherf build his opinions on the work of another expert, when he has not independently verified that work.[3] *See, e.g., Am. Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985) ("Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not."); *McLeod v. Dollar Gen.*, No. 13-3113,

---

[3]    Scherf later claims that UAS has lost enterprise value to the tune of ███ as of the end of 2017. In fact, the Barnes reports show that UAS was worth *more* as a going concern as of the end of 2017 than in any prior year. *See* Ex. K (Dep. Ex. 50) at UAS-HC-00005427, 5469, 5510, 5551, 5592, 5629, and 5667. Regardless, again, Scherf bases this entirely on paraphrase of a Barnes' report, not his own work. He cannot offer this opinion at trial.

2014 WL 4634962, at *6 (E.D. Pa. Sept. 16, 2014) (Rule 703 "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.") (quoting *Loeffel Steel Prod., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005))); *Legendary Art, LLC v. Godard,* No. 11-0674, 2012 WL 3550040, at *1 (E.D. Pa. Aug. 17, 2012) (expert could not build business valuation on the plaintiff's projections where the expert had not "engaged in any independent verification of the projections"); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 – 66 (S.D.N.Y. 2007) (expert opinion that relied on analysis that was "beyond [the expert's] ken" and conducted by another analyst from the expert's company was inadmissible) (internal quotations omitted)). For this reason and the other reasons discussed above, this part of Scherf's opinion must also be excluded.

## IV.   SCHERF'S METHODOLOGY FOR CALCULATING RE-INVESTMENT COSTS ON EXISTING RAVEN ANALOG EQUIPMENT IS ALSO FLAWED.

### A.   Scherf Has No Sound Methodology for Identifying and Calculating Replacements Cost Damages for past Replacements.

Scherf opines that UAS was forced to replace certain Honeywell analog systems that it leased to customers sooner than would have been necessary if Honeywell had developed a Raven IP system as allegedly promised. In support of this, Scherf again pretends to be an expert on video surveillance products, opining that "[t]he installed Honeywell Raven analog products had less value to UAS and its customers due to its assumed breach," and the alleged breach *caused* UAS to "incur additional equipment and installation costs on certain of its existing customers." Scherf Rep. at 14. Scherf's training and professional experience do not equip him to offer these opinions.

To calculate the damages in this category, Scherf again relies on *timing* as the sole proxy for causation. He lists *every* UAS lease customer that replaced a Honeywell system after the alleged breach and within five years after the installation of the original Honeywell machine. *See*

*id*. at Ex. 4A. He then opines that the full cost of the replacement systems, more than █████,

count as damages. But Scherf (again) makes zero effort to narrow this down to systems that had

to be replaced *because of the alleged breach*. Pressed on how Honeywell's performance of the

alleged Integration Agreement would have alleviated the need to replace the systems identified on

his Exhibit 4A, Scherf could not explain:

> Q. Had Honeywell fulfilled its obligations under the integration agreement, how would that address the need for a new replacement system at █████████ on September 24 of 2014?
>
> A. Well, if Honeywell had agreed to and accept its obligation under the Integration Agreement, as I said before, we wouldn't be here. I wouldn't have been engaged. I wouldn't have done all this work.
>
> Q. Doesn't answer my question. How would it have avoided the need to install another Honeywell system on September 24th of 2014? What was it Honeywell was supposed to do that it didn't do that led to the need to install that system on September 24 of 2014, just as one example?
>
> A. I don't know the answer as I'm sitting here. I have to think about that.
>
> Q. Okay. Would that be true for all the others on Exhibit 4 A as well?
>
> A. Yeah, other than how I've already came to that number.

Scherf Tr. at 236 – 237. Asked *why* UAS had replaced the systems on his Exhibit 4A and how this

related to the alleged breach, Scherf responded "[b]ecause it wasn't functioning properly. . . . [I]f

it was functioning properly, they wouldn't have replaced it. *Id*. at 222. But could Scherf state that

a given machine on his list was replaced due to a *malfunction*? "Specifically that one? Not as I'm

sitting here." *Id*. at 223. The *only* thing he knows about the machines on his list is their dates of

installation and replacement—nothing more. *Id*. And his report cited *no evidence* that the alleged

breach (as opposed to other factors) led, for example, to the installation of a second Honeywell

machine at █████████ on September 24, 2014—only weeks after the first Honeywell system

was installed on August 31, 2014. *See* Scherf Rpt. at Ex. 4A.

In reality, there is no reason to believe that the systems on Scherf's Exhibit 4A were malfunctioning *or* that Honeywell's performance under the alleged Integration Agreement would have alleviated the need to replace them. As Scherf himself admitted, UAS's allegation is that Honeywell was supposed to have *started development* of a new Raven IP system in the third quarter of 2014, but deliveries of that system would not have occurred for another year or two. Scherf Tr. at 227 – 228. If deliveries would not have started until 2016 or later, then there is no plausible explanation for how Honeywell's performance would have alleviated the need to replace existing Raven analog systems as early as September 24, 2014, as Scherf opines.

Even if one accepted the untenable premise that Honeywell's performance would somehow have delayed the replacement of the machines on Scherf's Exhibit 4A, UAS does not allege that Honeywell would ever have been obligated to ship them new Raven IP machines *for free*. *See* Am. Compl. ¶ 76. Yet Scherf deducts *nothing* to account for whatever UAS would have had to pay to purchase replacement systems in a world where Honeywell had *not* breached any alleged agreement. Scherf Tr. at 229 – 235. Nor does Scherf deduct anything for the years of service and revenues UAS did get out of those machines before their replacement. *Id.*

Scherf's damages model therefore invites a windfall, double recovery in the form of free use and replacement of Honeywell equipment. *Fin. Cas. & Sur., Inc. v. Bonino*, No. 11-4316, 2015 WL 6442412, at *3 (D.N.J. Oct. 22, 2015) ("compensatory damages for breach of contract . . . does not allow for double recovery, but rather is designed under the law to place the injured party in as good a monetary position as it would have enjoyed if the contract had been performed as promised" (internal quotation marks omitted)). This is not legally permissible, and it is not an appropriate damages methodology.

**B.      Scherf Cannot Testify on Millions of Dollars in Future Damages "Exposure."**

Scherf next identifies ███ existing video surveillance systems—some from Honeywell and some from other manufacturers—that he anticipates UAS *might* need to replace in the future due in some way to Honeywell's alleged breach. Why? Again, it is all about timing: the ███ customers on Scherf's list had new video surveillance systems (from one manufacturer or another) installed within five years before the date of Scherf's report. Scherf figures some or all of these customers will get new systems before their leases are up for renewal, and Honeywell should pay for them. Scherf then opines that the average replacement cost of these systems is ███, leading to approximately ███ in "exposure" to future replacement costs. This approach is indefensible.

First, there is neither rhyme nor reason to the criteria by which Scherf identified the ███ UAS lease customers whom he opines may become future sources of damages. He simply selected *every* UAS lease customer who got a new machine within the five years before Scherf issued his report. Scherf goes so far as to charge Honeywell with the obligation to replace *non-Honeywell equipment* that UAS decided to install years after the alleged breach. *See* Scherf Rep. at Ex. 4B (listing dozens of customers who had Dahua, not Honeywell, machines installed years after the alleged breach). Scherf has done nothing to identify or isolate the customers that are likely to require early replacements *because of something Honeywell did or failed to do*. He has simply identified a group of UAS customers based upon an arbitrary time cutoff and called them sources of *damages*—with no established nexus to Honeywell or the alleged breach.

Second, repeating the mistake from his prior section, Scherf opines that Honeywell should pay the *full* replacement cost for this portion of its installed base—regardless of how long the systems have operated and how much UAS would have paid for replacements absent any alleged breach. Again, this would lead to a windfall recovery for UAS.

Third, Scherf opines that the cost to replace each of these systems will be exactly ██ —

a round number seemingly pulled from thin air and supported by no rigorous calculations. Scherf

admits this is not a real number. He "wanted to use approximation because it's an exposure item

and I didn't want to calculate it to the penny because that would give the sense, in my view, false

sense of anything other than an approximation. . . . We should think it's all ████." We think

it's a number in between." Scherf Tr. at 253. This is not a damages methodology. It is a closing

argument to ask a jury to give UAS more money.

Scherf would nevertheless like to testify about his views on these topics so "the jury can

take what it sees is worth from that exposure." *Id.* at 251. But Scherf himself acknowledges that

he has reached no opinion on damages in this category to a reasonable degree of professional

certainty. *Id.* at 250. This alone is sufficient to exclude this part of Scherf's opinion. *See, e.g., Ware

v. Rodale Press, Inc.*, 322 F.3d 218, 226 (3d Cir. 2003) ("At a minimum, reasonable certainty

embraces a rough calculation that is not too speculative, vague or contingent upon some unknown

fact." (internal quotation marks omitted)).

## V.   SCHERF'S CALCULATION OF EMPLOYEE COSTS ATTRIBUTABLE TO THE ALLEGED BREACH IS LIKEWISE FATALLY FLAWED.

Scherf next calculates damages in the form of "Ongoing Support Costs of the Raven

Analog" system. According to Scherf, after the alleged breach on September 22, 2014, "Honeywell

stopped all future development and product support of the Raven system," and left UAS "to

support the Raven analog with its own staff." Scherf Rep. at 15 – 16. Scherf opines that more than

██ UAS employees each spent a portion of their time supporting the Raven analog system

between September 2014 and September 2018, and that a portion of their salaries are therefore

damages that Honeywell owes to UAS. There are numerous problems with this.

First, Scherf's premises are false. UAS's own president and corporate designee admitted that Honeywell continued to provide on-site technical support to UAS at least through the date of his September 2018 deposition. *See, e.g.*, Ex. L (UAS Tr.) at 255 – 256. He also admitted that Honeywell delivered software enhancements for the Raven analog system *after* September 22, 2014. *See, e.g.*, Ex. M (UAS Tr.) at 475 – 476.

Second, Scherf implicitly assumes that Honeywell's fulfillment of the alleged Integration Agreement would somehow have enabled UAS immediately to cease incurring all expenses associated with monitoring and servicing its installed base of ███ Raven analog systems. But Scherf himself acknowledges that no Raven IP system would have been available for delivery until a year or two *after* the alleged breach in September 2014. *See* Scherf Tr. at 32 – 33. Even then UAS's alleged plan was "to transition the installed analog customer base at a pace it could have chosen…" Scherf Rep. at 8; Am. Compl. ¶ 69. The time UAS employees spent monitoring, troubleshooting, and servicing its installed base of ███ Raven analog systems would not have disappeared overnight on September 22, 2014.[4]

Despite this, Scherf identifies more than ███ UAS employees whom he opines spent various percentages of their time on the Raven analog system as a result of the alleged breach— time he contends they would not have spent if Honeywell had fulfilled its purported obligations under the Integration Agreement. Scherf opines that a portion of each individual's salary should therefore be treated as "damages" resulting from the breach. How does Scherf arrive at the

---

[4] Scherf claimed to recall evidence that Honeywell was supposed to deliver bug fixes for the Raven analog system in October 2014. Scherf Tr. at 261 – 263. But Scherf has no professional background on the basis of which to opine that these bug fixes, whatever that means, would immediately have eliminated the work of ███ of UAS employees. And Scherf did not attempt to identify those damages flowing from the purported failure to deliver bug fixes for the Raven analog system separate from those flowing from the alleged failure to deliver a Raven IP system, at issue in the Amended Complaint. *See id.* at 267 – 269.

percentages and other numbers he uses for his calculations? Again, through unquestioning acceptance of anything UAS tells him. Specifically, UAS management provided Scherf with a list of UAS employees who purportedly spent time on the Raven analog system from 2012 through 2017. *See* Ex. N (Dep. Ex. 282). UAS's spreadsheet says how much time each person is estimated to have spent on issues relating to the Raven analog system from 2012 to 2017, ranging from ██ ████, with no variation year over year. Scherf moved that information into his own Excel file (which has not been produced to Honeywell), removed the years 2012 and 2013 (because they pre-dated the alleged breach), and removed the line for UAS President Scott Elkins (because he would have worked there regardless of the alleged breach). Scherf Tr. at 283 – 285.

That is literally everything Scherf did to come to his opinion that Honeywell owes UAS more than ████████ in damages flowing from personnel costs. Scherf did not remove the salaries or time associated with the first nine months of 2014, notwithstanding that he assumes the breach occurred on September 22, 2014. *See id.* at 269 – 273 (acknowledging that this was a mistake). He did not attempt to determine how Honeywell's performance under the alleged contract would possibly have eliminated 100% of these employee's work related to the Raven analog system. *Id.* at 279 – 282. He did nothing to confirm that any of these people actually worked on the Raven analog system or spent the percentages of their time reported on UAS's spreadsheet. *Id.* at 277–279. He did not, for example, perform any kind of time study to confirm the numbers reported to him by UAS management. *Id.* at 279 (a time study "wasn't cost effective"). While Scherf appropriately treated UAS's President as a "fixed" cost that would not have varied regardless of the assumed breach, he gave no similar consideration to its Vice President of Operations, who alone accounts for more than ███████████ in the supposed damages in this category. *Id.* at 279 – 281.

Far from using any reliable methodology to ascertain the *damages* from Honeywell's alleged breach, Scherf—again—simply took whatever UAS gave him and did the arithmetic. Scherf should not be permitted to present the resulting numbers as the opinion of an expert. *See Bruno*, 311 F.R.D. at 137 ("[B]lind adherence to data absent any sort of independent investigation stops short of the type of reliability contemplated by *Daubert*").

## CONCLUSION

Scherf has no professional experience with video security, the security market, or the technologies at issue in this matter. His opinion rests on a host of questionable suppositions authored by UAS's management and other consultants, which Scherf did nothing to verify independently. His data are riddled with errors and contradictions. And none of his opinions are calculated to identify customer losses, equipment costs, and employee costs that occurred *as a result of the alleged breach*, as opposed to other factors. Honeywell respectfully requests that Scherf's opinions be excluded in their entirety and that Scherf not be permitted to testify at any trial of this matter.

Dated: February 8, 2019

**MARSHALL DENNEHEY WARNER**
**COLEMAN & GOGGIN**

KEVIN E. HEXSTALL, ESQUIRE
Attorney ID. No. 81248
kehexstall@mdwcg.com
2000 Market Street
Suite 2300
Philadelphia, PA 19103
215-575-2600
215-575-0856

and

**GREENE ESPEL PLLP**

s/ Mark L. Johnson
Mark L. Johnson, Reg. No. 0345520,
    *pro hac vice*
Holley C. Horrell, Reg. No. 0399636,
    *pro hac vice*
Anna M. Tobin, Reg. No. No. 395706,
    *pro hac vice*
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
mjohnson@greeneespel.com
sdunlop@greeneespel.com
hhorrell@greeneespel.com
atobin@greeneespel.com
(612) 373-0830

Attorneys for Defendant, Honeywell International
Inc.

## CERTIFICATE OF SERVICE

On February 8, 2019, I caused to be served a true and correct copy of the foregoing

Defendant Honeywell International Inc.'s Memorandum in Support of Its Motion to Exclude the

Expert Testimony of Stephen Scherf, upon the following counsel of record by electronic mail as

follows:

| | |
|---|---|
| Mark L. Rhoades | Joseph M. Profy |
| Rhoades LLC | Jacobs Law Group PC |
| 1528 Walnut Street, Suite 1650 | 2005 Market Street, Suite 1120 |
| Philadelphia, PA 19102 | Philadelphia, PA 19103 |
| mrhoades@rhoadesllc.com | jprofy@jacobslawpc.com |

Dated: February 8, 2019                    **GREENE ESPEL PLLP**

s/ Mark L. Johnson
Mark L. Johnson, Reg. No. 0345520,
    *pro hac vice*
Holley C. Horrell, Reg. No. 0399636,
    *pro hac vice*
Anna M. Tobin, Reg. No. No. 395706,
    *pro hac vice*
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
mjohnson@greeneespel.com
sdunlop@greeneespel.com
hhorrell@greeneespel.com
atobin@greeneespel.com
(612) 373-0830

Attorneys for Defendant, Honeywell
International Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNIVERSAL ATLANTIC SYSTEMS, | Case No. 17-4660 |
| Plaintiff, | |
| v. | |
| HONEYWELL INTERNATIONAL INC., | |
| Defendant. | |

**DECLARATION OF MARK L. JOHNSON
IN SUPPORT OF HONEYWELL INTERNATIONAL INC.'S
MOTION TO EXCLUDE TESTIMONY OF STEPHEN SCHERF
PURSUANT TO DAUBERT V. MERRELL DOW PHARMACEUTICALS, INC.
WITH EXHIBITS A-N**

# FILED UNDER SEAL

CONTAINS DISCOVERY MATERIAL MARKED HIGHLY CONFIDENTIAL OR CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER