# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNIVERSAL ATLANTIC SYSTEMS, INC.,
a Pennsylvania corporation,

        Plaintiff,

    vs.

HONEYWELL INTERNATIONAL, INC., a
Delaware corporation,

        Defendant.

Civil Action No. 2:17-cv-04660-WB

## ORDER

**AND NOW**, this _____ day of _____, 2019, **IT IS HEREBY ORDERED** that Honeywell International Inc.'s Motion to Exclude the Expert Testimony of Stephen Scherf is **DENIED**.

_____
**J. BEETLESTONE**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNIVERSAL ATLANTIC SYSTEMS, INC.,
a Pennsylvania corporation,

        Plaintiff,

vs.

HONEYWELL INTERNATIONAL, INC., a
Delaware corporation,

        Defendant.

Civil Action No. 2:17-cv-04660-WB

## PLAINTIFF UNIVERSAL ATLANTIC SYSTEMS, INC.'S RESPONSE AND OPPOSITION TO DEFENDANT HONEYWELL INTERNATIONAL INC.'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF STEPHEN SCHERF

Plaintiff Universal Atlantic Systems, Inc. ("UAS"), by and through its attorneys, hereby respond to and opposes Defendant Honeywell International Inc.'s ("Honeywell") Motion to Exclude the Expert Testimony of Stephen Scherf ("Hon. Dau. Mot.") for all the reasons more fully set forth in the attached Memorandum of Law, which is incorporated herein by reference.

WHEREFORE, UAS respectfully requests the Court enter an Order denying Honeywell's Motion.

Dated: March 1, 2019

**RHOADES LLC**

By:    MARK L. RHOADES, ESQUIRE
Attorney ID No. 80641
mrhoades@rhoadesllc.com
1528 Walnut Street, Suite 1650
Philadelphia, PA 19102
215-496-9002 T
215-893-3960 F

and

**THE JACOBS LAW GROUP**

/s/ Joseph. M. Profy
JOSEPH M. PROFY, ESQUIRE
Attorney ID No. 77141
jprofy@jacobslawpc.com
2005 Market Street, Suite 1120
Philadelphia, PA 19103
215-569-9701 T
215-569-9788 F

Attorneys for Plaintiff,
Universal Atlantic Systems, Inc.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNIVERSAL ATLANTIC SYSTEMS, INC.,
a Pennsylvania corporation,

        Plaintiff,

vs.

HONEYWELL INTERNATIONAL, INC., a
Delaware corporation,

        Defendant.

Civil Action No. 2:17-cv-04660-WB

## PLAINTIFF UNIVERSAL ATLANTIC SYSTEMS, INC.'S MEMORANDUM OF LAW IN OPPPOSITION TO DEFENDANT HONEYWELL INTERNATIONAL, INC.'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF STEPHEN SCHERF

## Table of Contents

INTRODUCTION .................................................................................................... 1

STEPHEN SCHERF'S EXPERT REPORT ............................................................... 2

Scherf's Calculation of Damages Based on Loss of Existing Customers ..................... 3

Scherf's Calculation of Damages Based on Loss of New UAS Customers ................... 6

Re-Investment Costs on Existing Honeywell Raven Customers .................................. 7

Ongoing Support Costs of the Raven Analog ............................................................. 8

ARGUMENT ......................................................................................................... 8

I.   Applicable Legal Standard. ............................................................................ 8

II.  Scherf is Undeniably Qualified to Offer the Opinions Expressed in His Report ............. 9

III. Scherf's Methodology in Calculating Damages from the Loss of Existing Customers is
     Reliable and No Basis Exists to Exclude His Testimony. ................................ 12

     A) Scherf's Use of a Ten-Year Average life of a UAS Customer does not Render the
        Methodology Unreliable ............................................................................... 13

     B) Scherf's Methodology Accounts for the Loss of Customers Unrelated to the
        Honeywell Breach Through the Application of Historical Attrition Rates and
        Excludes Other Factors from a Damages Perspective ..................................... 17

     C) Any Data Discrepancies Have Been Rectified and Scherf's Updated Expert Report
        Employs the Same Methodology .................................................................. 20

     D) Scherf's Expense Deduction is Warranted and Fully Supported ..................... 22

IV.  Scherf's Methodology in Calculating Damages from the Loss of New UAS Customers
     is Reliable and No Basis Exists to Exclude His Testimony ............................. 24

V.   Scherf's Methodology for Calculating Re-Investment Costs of Existing Raven Analog
     Equipment is Reliable and No Basis Exists to Exclude His Testimony. ............. 28

VI.  Scherf Must be Allowed to Discuss UAS's Future Exposures Attributable to the
     Assumed Breach ....................................................................................... 29

VII. Employee Costs Attributable to the Breach is a Compensable Damage ............. 30

# TABLE OF AUTHORITIES

**Cases**

Pages

*ActiveVideo Networks, Inc. v. Verizon Communs., Inc.,*
694 F.3d 1312 (Fed. Cir. 2012)................................................................16

*American Key Corporation v. Cole National Corporation,*
762 F.2d 1569 (11th Cir. 1985)...............................................................28

*Angelopoulos v. Keystone Orthopedic Specialists,*
S.C., No 12-cv-5836, 2017 U.S. Dist. LEXIS 74102 (N.D. Ill. May 16, 2017)....................27

*Atlas Truck Leasing, Inc. v. First NH Banks, Inc.,*
808 F.2d 902 (1st Cir. 1987)...................................................................25

*Benjamin v. Peter's Farm Condo. Owners Ass'n,*
820 F.2d 640 (3d Cir. 1987) )..................................................................16

*Bolus v. United Penn Bank,*
525 A.2d 1215 (Pa. 1987)......................................................................18

*Breedlove v. CSX Transp., Inc. (In re Asbestos Prods Liab. Litig),*
No. 09-cv-75120, 2011 U.S. Dist LEXIS 13087 (E.D. Pa. Feb. 10, 2011)....................14

*Brill v. Marandola,*
540 F.Supp. 2d 563 (E.D. Pa. 2008).................................................13, 14, 23

*CardioNet, LLC v. ScottCare Corp.,*
No. 12-2516, 2017 U.S. Dist. LEXIS 173622 (E.D. Pa. Oct. 19, 2017)..............9, 12, 26,

*Constellation NewEnergy, Inc. v. Powerweb, Inc.,*
No. 02-2733, 2004 U.S. Dist. LEXIS 32083 (E.D. Pa. Aug. 19, 2004)....................11, 28

*Conwood Co., L.P. v. U.S. Tobacco Co.,*
290 F.3d 768 (6th Cir. 2002)..................................................................20

*Cummins v. Standard Register Co.,*
265 F.3d 56 (1st Cir. 2001)....................................................................20

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993)....................................................................1, 9, 12, 19

*DeLuca v. Merrell Dow Pharm., Inc.,*

911 F.2d 941 (3d Cir. 1990)................................................................12

*Elcock v. Kmart Corp.,*
233 F.3d 734 (3d Cir. 2000)...........................................................10

*Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs.,*
546 F.Supp.2d 155 (D.N.J. 2008)...............................................5, 11, 20, 26

*In re Actiq Sales & Mktg. Practices Litig,,*
No. 07-4492, 2014 U.S. Dist. LEXIS 98441 (E.D. Pa. July 21, 2014)...............9, 12

*In re DVI, Inc. Secs. Litig.,*
No. 03-5336, 2013 U.S. Dist LEXIS 164199 (E.D. Pa. Nov. 18, 2013)...............12

*In re Mushroom Direct Purchaser Antitrust Litig.*
No-06-0620, 2015 U.S. Dist. LEXIS 120892 (E.D. Pa. July 29, 2015)...............16

*In re Paoli R.R. Yard PCB Litig.*
35 F.3d 717 (3d Cir. 1994)................................................................12

*Jaasma v. Shell Oil Co.,*
412 F.3d 501 (3d Cir. 2005)..............................................................14

*James Corp v. North Allegheny School District,*
938 A.2d. 474 (Pa. Commw. Ct. 2007).................................................18

*JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.,*
No. 97-0652, 1998 WL 175888 (E.D. Pa. Apr. 15, 1998)............................16

*Kannankeril v. Terminix Intm., Inc.,*
128 F.3d 802 (3d Cir. 1997)...............................................................9

*Karlo v. Pittsburgh Glass Works, LLC,*
849 F.3d 61, 81 (3d Cir. 2017)..........................................................12

*Legendary Art, LLC v. Godard,*
No. 11-0674, 2012 WL 3550040 (E.D. Pa. Aug. 17, 2012).........................28

*Main St. Mortg., Inc. v. Main St. Bancorp., Inc.,*
158 F.Supp.2d 510 (E.D. Pa. 2001)....................................................27

*Malletier v. Dooney & Bourke, Inc.,*
525 F.Supp. 2d 558 (S.D. N.Y. 2007)..................................................28

*McLeod v. Dollar General,*
No. 13-3113, 2014 WL 463492 (E.D. Pa. Sept. 16, 2014)..........................28

iv

*Montgomery v. Mitsubishi Motors Corp.*,
No. 04-3234, 2006 U.S. Dist. LEXIS 28936 (E.D. Pa. May 12, 2006)......................9, 24

*Mountbatten Sur. Co. v. AFNY, Inc.*,
2000 U.S. Dist. LEXIS 4601(E.D. Pa. Apr. 11, 2000)................................................25

*Packgen v. Berry Plastics Corp.*,
847 F.3d 80, 87 (1st Cir. 2017)..............................................................................20, 25

*Pineda v. Ford Motor Co.*,
520 F.3d 237 (3d Cir. 2008)....................................................................................9, 12

*Playtex Prods., Inc. v. P&G*,
2004 U.S. Dist. LEXIS 14084, (S.D.N.Y. July 26, 2004)...........................................27

*Robert Billet Promotions, Inc. v. IMI Cornelius, Inc.*,
No. 95-1376, 1998 U.S. Dist. LEXIS 4235 (E.D. Pa. Apr. 1, 1998)......................14, 24

*Schneider ex. Rel Estate of Schneider v. Fried*,
320 F.3d 396 (3d Cir. 2003)..........................................................................................9

*Scully v. US WATS, Inc.*,
238 F.3d 497 (3d Cir. 2001)........................................................................................18

*Sec. & Data Techs., Inc. v. Sch. Dist. Of Phila.*,
No. 12-2393, 2016 U.S. Dist LEXIS 175584 (E.D. Pa. Dec. 20, 2016).....................25

*Stecyk v. Bell Helicopter Textron*,
295 F.3d 408, 414 (3rd Cir 2002).................................................................................14

*Sterling v. Redevelopment Authority of the City of Philadelphia*,
836 F.Supp. 2d 251 (E.D. Pa. 2011)............................................................................16

*Total Control, Inc. v. Danaher Corp.*,
338 F.Supp. 2d 566, 570 (E.D. Pa. 2004).....................................................................14

*Tormenia v. First Investors Realty Co.*,
251 F.3d 128, 135 (3d Cir. 2000).................................................................................14

*Vapco, Inc. v. Perfecta Prods.*,
No. 10-CV-399, 2011 U.S. Dist. LEXIS 161926 (M.D. Fla. May 5, 2011).................13

*Waldorf v. Shuta*,
142 F.3d 601 (3rd Cir.1998).........................................................................................10

*Wonderland Nurserygoods Co. v. Thorley Indus, LLC,*
2013 U.S. Dist. LEXIS 171399 (W.D. Pa. Dec. 5, 2013)................................................27

*ZF Meritor LLC v. Eaton Corp.,*
646 F.Supp. 2d 663 (D.Del. 2009).....................................................................16, 22

**Rules**

*Fed. R. Evid. 702*.....................................................................................8, 9, 13, 14
*Fed. R. Evid. 702 advisory committee's note to 2000 amendment*.......................................9

## INTRODUCTION

Honeywell's filing is a cross-examination masquerading as a *Daubert* Motion.

Honeywell does not, in any meaningful way, challenge Scherf's methodology – how could it

when its own expert, Mr. Baturka ("Baturka"), adopted not only Scherf's methodology but also

the same four damages categories and then proceeded to opine to a reasonable degree of

professional certainty that UAS suffered millions of dollars in damages. Instead, Honeywell

devotes page after page taking issue with the assumptions/inputs used in the methodology. All of

which may well be appropriate for cross-examination at trial but none of which renders Scherf's

methodology unreliable and/or his testimony inadmissible.

Furthermore, Honeywell repeatedly claims Scherf is offering opinions that he simply is

not offering. Scherf assumed liability and, as all damages experts are required to do, is offering

an opinion as to causation from a damages' perspective based on his analysis. It is perfectly

appropriate for him to do so. This attack on Scherf is not only unfounded but also odd as

Honeywell has not moved on causation grounds in its Motion for Summary Judgment.

Honeywell has admitted that the jury will decide whether Honeywell's breach caused (from a

legal perspective) the damages calculated and opined to not only by Scherf but also by Baturka.

If the jury finds liability it will presumably arrive at a damages figure somewhere between

Baturka's $5.1 million and Scherf's $15.5 million after considering the facts established at trial

and the testimony of each side's experts.

Honeywell's other arguments have even less merit. It is undeniable that Scherf is

qualified to render the opinions set forth in his report. Scherf has an impressive educational and

credentialed background, decades of experience as a valuation/economic damages expert and has

been qualified as a damages' expert numerous times in both state and federal courts. Finally, a

1

data issue was identified during the expert discovery phase and Scherf has issued an Updated Expert Report. This is no different from what Baturka did earlier in this case upon UAS identifying an issue with the data he had employed. The Updated Expert Report reduces Scherf's damages calculations from $16,619,714 to $15,498,122. This adjustment is driven by a change in the data, not methodology, and thus offers no basis for exclusion. Honeywell's Motion must be denied in its entirety.

## STEPHEN SCHERF'S EXPERT REPORT

Scherf was engaged to determine the economic damages sustained by UAS as a result of an alleged breach of contract by Honeywell. Scherf Expert Report Updated as of February 28, 2019 ("Scherf Up. Rep.") at 1.[1] Scherf's analysis and opinion assumed that Honeywell and UAS entered into the Integration Agreement (defined in the Complaint) and Honeywell breached on September 22, 2014. Scherf Up. Rep at 1 and 7. Scherf did not form or provide an opinion on liability. Scherf Up. Rep. at 1. Scherf reviewed the deposition transcript (and corresponding exhibits) of every witness in the case as well as other documents produced during the litigation. Scherf Up. Rep. App. B. Scherf also conducted numerous interviews and meetings with UAS personnel (including its President Scott Elkins ("Elkins") and its CFO John Christie ("Christie")) as well as interviewing Michael Barnes ("Barnes") of Barnes Associates. Scherf Up. Rep. at 6.[2] Scherf also obtained and reviewed source material and data from Barnes concerning the security industry. Scherf Up. Rep. App. B.

---

[1] Scherf has issued an Updated Expert Report as of February 28, 2019. Ex. A ("Scherf Up. Rep.") During expert discovery it was revealed that one spreadsheet relied upon by Scherf contained some entries that should have been excluded. Also, Scherf's calculation of the Ongoing Costs of the Raven Analog System contained a mathematical error which was corrected. The text of Scherf's Updated Expert Report is unchanged with only the exhibits and calculations of the damage numbers modified. Scherf's Original Report is attached as Ex B.

[2] Baturka identified Barnes as a leading voice in the alarm industry and a respected consultant to companies in the industry. Ex. C ("Baturka Rep.") at p. 4 n. 7 and 8.

2

Scherf did consider causation and mitigation issues, from a damages' perspective, to determine if Honeywell's acts were a significant or material factor in contributing to the loss suffered by UAS. Scherf Up. Rep. at 7. UAS' damages were calculated in four separate categories: 1) Loss of Existing UAS Customers; 2) Inability by UAS to Acquire New Customers; 3) Increased Cost to UAS to Retain Existing Customers; and 4) Incremental Support Costs on the Raven Analog Product Incurred by UAS.[3] Scherf Up. Rep. at p. 8. Scherf opined, to a reasonable degree of professional certainty, that the economic damages to UAS were $15,498,122. Scherf Up. Report at p. 8.[4] Baturka, after explicitly adopting Scherf's methodology and adjusting Scherf's calculations as necessary to reflect the errors and inconsistencies he identified, opined to a reasonable degree of professional certainty, that the amount of lost profits incurred as a result of the alleged breach was between $1,895,550 and $5,175,707.[5] Baturka Rep. at pp. 7 -12.

### Scherf's Calculation of Damages Based on Loss of Existing Customers

Assuming the of existence of and breach of the Integration Agreement, UAS was left with a compromised analog product as well as no IP product that it would have and should have had. UAS was harmed because existing customers: 1) that wished to switch to IP Video, did not have a competitive product; 2) that were opening new facilities, did not have a product that allowed them to have analog alongside digital, both managed by a single platform, and 3) were now more susceptible to marketing of UAS competitors and receptive to seeking competitive

---

[3] Baturka calculated damages in these same four categories. Baturka Rep. at p 7.
[4] Scherf's Original Report calculated damages in the amount of $16,619,714.
[5] Baturka's original opinion of $2,212,286 and $4,700,840 was changed due to becoming aware of more accurate data and the fact that he had misunderstood some of the data that had been produced by UAS. During his deposition, Baturka testified that his opinion was that the damages to UAS as a result of the alleged breach were between $1,895,550 and $5,175,707. Ex D ("Baturka Dep.") at p 119, Ex E (Exhibit 408). Baturka testified any number within his range was reasonable. Baturka Dep. at p. 56.

bids for systems (decreased customer stickiness). Scherf Up. Rep. at p. 9. [6] UAS lost customers at a significantly higher rate in the time period after the breach as compared to the time period before the breach. Scherf Up. Rep. at pp. 9-11.

The loss of existing customers is measured in the security industry by attrition rates.[7] Both UAS and the industry at large track both RMR (recurring monthly revenue) as well as attrition (the rate at which customers leave). Scherf Up. Rep. at p. 9 n. 21. Prior to the alleged breach in September of 2014, UAS attrition rates were lower than the industry average but then spiked significantly after the breach and are now above the industry average. Scherf Up. Rep. at p. 10 n. 22.

To calculate the damage to UAS, Scherf analyzed the difference between the attrition rates in the un-impacted period *(i.e.* prior to the breach) and the impacted time periods *(i.e.* after September of 2014) for the entire UAS business as well as the specific UAS Honeywell video portion of the business. Scherf Up. Rep. at p. 10. In addition, Scherf compared the attrition rates that UAS experienced in its alarm and Honeywell video business in the un-impacted period and the impacted time period. *Id.* These "Before and After" and "Yardstick Analysis" are commonly

---

[6] Scherf is not offering opinions as to the state of the analog and IP technology or the security business market in general circa 2014. Various UAS witnesses testified as to the effects of Honeywell's decision to unilaterally stop any further development on Phase 3 of the Integration Agreement including Elkins and Christopher McGurk ("McGurk"). These are factual issues to be decided by the jury at trial. As set forth *infra*, damages experts are clearly allowed to rely on the testimony generated and the documents produced in the litigation for the factual assumptions of their opinions.

[7] The attrition rate is measured as the rate or percentage of customers that stop service. The customer and associated revenue loss are recorded in the month that service stops, and that revenue loss is measured as that month's lost revenue (that one month only) regardless of how many months are remaining on a contract. Scherf Up. Rep. at p. 9 n. 18.

accepted methodologies in valuation and damages literature.[8] Employing this sound and commonly accepted methodological approach has the effect of cabining damages to the specific UAS Honeywell video business as that was the business at issue in this case. *Id.* Furthermore, the trend in the UAS attrition rate for its video business was compared to the UAS attrition rate for its alarm business. *Id.* This analysis of the attrition rate for the UAS alarm business was performed to confirm that the increased attrition in the video business was related to the Honeywell breach as opposed to other potential causes such as increases in UAS attrition rate for all business lines and other factors affecting the entire UAS business. *Id.* This analysis showed that while UAS attrition rates and trends for alarm and video were similar in the non-impacted period, the attrition rates for the video business increased significantly in the impacted period, while alarm attrition rates did not. *Id.* The consistent alarm attrition, that had no change in trend during the impacted time period, demonstrated that the change in the video attrition rate was due to Honeywell's breach as opposed to any UAS specific or industry specific reason. *Id.* Ex. F ("Scherf Dep.") at pp. 40-44.

To further isolate the cause of the increased attrition, Scherf examined other potential factors for the increased attrition rates impacting only the video segment of UAS' business during the impacted period that could have caused the difference in attrition rates. Scherf Dep. at pp. 41-44. Scherf did not identify any other factor that would have caused the discrepancy between the attrition rates for the video business before and after the assumed breach. Scherf Dep. at pp. 41-44. Scherf examined information including the annual valuations performed by Barnes in the ordinary course of business and not for purposes of this litigation, which included

---

[8] Scherf Up. Rep. at p.10 n. 23. *See also Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs.*, 546 F.Supp.2d 155, 172 (D.N.J. 2008).

analysis of economic and industry conditions as well as economic trends in general and discussed these issues with Barnes. *Id.*

The Loss of Existing Customers analysis consisted of seven steps: 1) Raven analog customers that UAS lost after the breach were quantified; 2) the remaining contract life for each lost customer was calculated and the lost Recurring Monthly Revenue ("RMR") was multiplied by the remaining months of the contract; 3) the loss was projected out past the end of the current contract term to account for an historical expected customer life of 10 years; 4) an attrition rate of ▮ was applied to the calculation to remove lost RMR that was caused by factors other than the assumed breach; 5) future lost RMR was reduced to present value as of the date of the Expert Report; 6) a discount rate was applied to account for the time value of money and risks associated with the future stream of RMR; and 7) incremental labor costs necessary to service the lost RMR was subtracted. Scherf Up. Rep. at 10-11. Applying this methodology, Scherf calculated the damage to UAS from the Loss of Existing Customers to be $9,518,355. Scherf Up. Rep. at p.10. Baturka performed the same steps in his analysis. Baturka Rep. at pp. 7-9.

### Scherf's Calculation of Damages Based on Loss of New UAS Customers

The assumed breach left UAS without an IP product/service and or a competitive IP product/service from the time of the breach in September of 2014 until October/November of 2017.[9] Scherf Up. Rep. at p. 11 n. 29. The inability to acquire new customers negatively impacted UAS' ability to generate new RMR from video customers during the applicable time period. Scherf Up. Rep. at p. 12.

The Loss of New UAS Customers analysis entailed the following nine steps: 1) An examination of the actual growth of new customer RMR from 2008 until 2018 Q3 in both

---

[9] Again, Scherf is not offering an opinion on this point. *See* Footnote 6.

absolute dollar terms as well as a percentage of beginning period RMR demonstrated the negative impact of not having a competitive IP video product; 2) Between 2007 and 2013 the average annual RMR growth rate, a period that included the great recession, was ███ percent and in 2013 the growth rate was ███ percent; 3) Scherf assumed that but for the breach, new customer RMR would have grown at the 2013 annual growth rate during the period 2014-2017; 4) From 2014 to 2017, the difference between this expected new customer RMR and the actual UAS new customer RMR was ███ 5) New customer RMR in 2017 was higher than in 2016 and 2018 continues this upward trend; 6) Although the new customer RMR growth has not returned to pre-2013 levels, Scherf conservatively limited the damage period to 2017; 7) New customer RMR is recorded as a single month of revenue in the month that the new customer starts paying without regard to the length of contract and any subsequent renewals; In 2013 a dollar of RMR revenue was valued at a multiple of ███ 8) Industry multiples of RMR revenue range between ███ over the last 10 years; and 9) The value to UAS of a ███ loss in new customer revenue RMR is therefore ███ and the value for a loss of ███ in RMR is therefore ███ Scherf Up. Rep. at pp. 12-13.

## Re-Investment Costs on Existing Honeywell Raven Customers

In September of 2014, UAS was forced to seek alternatives other than Honeywell and this search for alternatives occurred later due to the assumed breach.[10] Thus, the installed Honeywell analog products had less value to UAS and its customers due to the breach. Had UAS known that Honeywell would not perform Phase 3 of the Integration Agreement, UAS would not have continued to purchase Honeywell products in the amount it did. Because UAS installed these Raven analog products, it has and will continue to, incur additional equipment and

---

[10] Again, Scherf is not offering an opinion on this point. See Footnote 6.

installation costs on certain of its existing customers. Scherf Up. Rep at p. 13-14. Scherf calculated damages in the amount of $138,952 due to the need to replace Honeywell Raven Analog systems earlier than would have been required if the Integration Agreement had been completed. Scherf Up. Rep. at pp. 14-15.

## Ongoing Support Costs of the Raven Analog

After the assumed breach, Honeywell stopped future development and product support of the Raven system. The failure to adequately complete the Integration Agreement caused UAS to support the Raven analog system with its own staff. Scherf Up. Rep. at pp. 15-16. The damages in this category are measured by the actual incremental costs incurred after September of 2014 that were necessary to support the installed base of Honeywell Raven systems and total $1,906,270.[11] Scherf Up. Rep. at p. 16.

## ARGUMENT

I. **Applicable Legal Standard.**

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

---

[11] Scherf's Original Report contained a mistake in connection with the calculation of the amounts for the year 2014. Scherf Dep. pp. 272-275. This error has been corrected and the amount of damages for this category is now $1,906,270. Scherf Up. Rep at p.16.

The Third Circuit has explained that Rule 702 has "three major requirements": the proffered witness must: (1) "be an expert, *i.e.* must be qualified"; (2) "testify about matters requiring scientific, technical [,] or specialized knowledge", and (3) present testimony that "assist[s] the trier of fact." *In re Actiq Sales & Mktg. Practices Litig.*, No. 07-4492, 2014 U.S. Dist. LEXIS 98441, at * 8 (E.D. Pa. July 21, 2014) (*citing Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008). Thus, in order to be admitted, an expert's testimony must demonstrate "qualification, reliability, and fit." *Id.* (*citing Schneider ex. Rel Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).

Rule 702 has a "liberal policy of admissibility." *CardioNet, LLC v. ScottCare Corp.*, No. 12-2516, 2017 U.S. Dist. LEXIS 173622 at * 7 (E.D. Pa. Oct. 19, 2017) (*citing Pineda*, 520 F.3d at 243 (*quoting Kannankeril v. Terminix Intm., Inc.*, 128 f.3d 802, 806 (3d Cir. 1997)). As such, the rejection of expert testimony is the exception rather than the rule. *Id (citing to Fed. R. Evid. 702 advisory committee's note to 2000 amendment.*). Exclusion is the exception rather than the rule because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (*citing to Fed R. Evid. 702 advisory note to 2000 amendment citing to Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed. 2d 469 (1993)).

## II.   Scherf is Undeniably Qualified to Offer the Opinions Expressed in His Report.

Scherf is undoubtedly qualified to offer the opinions set forth in his Updated Expert Report. To determine whether the witness is qualified as an expert, requires a witness to have "specialized knowledge" about the area of the proposed testimony. *Montgomery v. Mitsubishi Motors Corp.*, No. 04-3234, 2006 U.S. Dist. LEXIS 28936 at * 12 (E.D. Pa. May 12, 2006)

(citing *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)). The basis of such knowledge may include "practical experience as well as academic training and credentials." *Id.* This requirement has been interpreted liberally to encompass "a broad range of knowledge, skills and training. *Id.* (quoting *Waldorf v. Shuta*, 142 F.3d 601 (3rd Cir.1998)).

Scherf has a B.B.A. in Accounting, a Master of Science in Finance and an Advanced Professional Certificate in Taxation and holds numerous certifications. Scherf Up. Rep Appendix A.[12] Furthermore, Scherf has taught for the American Institute of Certified Public Accountants, the National Association of Certified Valuators and Analysts and has presented at numerous conferences on topics including Advanced Valuation Applications and Models and Damages. *Id.* Based on his qualifications, education, and experience Scherf has been qualified as a damages' expert and testified at trial concerning lost profits and other forms of economic damages in numerous cases in the United States District Court for the Eastern District of Pennsylvania, the Court of Chancery in the State of Delaware as well as various Pennsylvania and New Jersey State Courts. *Id.*

Scherf was engaged to provide an expert opinion on the economic damages sustained by UAS as a result of an alleged breach of contract. He will testify that the economic damages sustained by UAS are $15,498,122. Economic damages in the form of lost profits and incremental costs etc., clearly falls within Scherf's qualifications, education and experience. Scherf is not offering an opinion as to liability (he assumed liability) and states explicitly that he

---

[12] Scherf is: 1) a Certified Public Accountant (CPA), 2) Accredited in Business Valuation from the AICPA (ABV), 3) Certified in Financial Forensics from the AICPA (CFF), 4) a Charter Global Management Accountant designation supported by the AICPA (CGMA), 5) a Certified Internal Control Auditor from Association for Internal Controls (CICA), 6) a Certified Insolvency and Restructuring from Advisory from the AIRA (CIRA), 7) a Certified Turnaround Professional from Turnaround Management association (CTP) and 8) a Certified Valuation Analyst from National Association of Certified Valuators and Analysts (CVA). *Id.*

10

formed no opinions on liability. Scherf Up. Rep. at p.1. As all damages' experts are required,

Scherf did consider causation and mitigation issues, from a damages' perspective, in order to

determine if Honeywell's acts were a significant or material factor in contributing to the loss

suffered by UAS. Scherf Up. Rep. at p. 7.[13] Scherf testified during his deposition that he has and

will offer the opinion that *based on his analysis* the Honeywell breach led to the loss of UAS

customers. Scherf Dep. at pp. 40-44 (emphasis added). Based on his education, qualifications

and experience, Scherf is clearly qualified to do so. *See Floorgraphics, Inc. v. News Am. Mktg.*

*In-Store Servs.*, 546 F.Supp.2d 155, 167-68 (D.N.J. 2008) (Numerous cases within our circuit

have held that an expert opining on a general matter is not required to have experience that is

narrowly tailored to the specific industry in question) and *Constellation NewEnergy, Inc. v.*

*Powerweb, Inc.*, No. 02-2733, 2004 U.S. Dist. LEXIS 32083 at * pp. 4-6 (E.D. Pa. Aug. 19,

2004) (While not specialized in accounting for the energy industry as such, an accountant was

sufficiently qualified to make the damages estimate contained in his report).[14]

---

[13] Scherf is not opining that the assumed breach left UAS with "a compromised analog product" and no IP Video product to offer to existing customers "that wished to switch to IP Video" or who "were opening new facilities" and wanted "to have analog alongside digital, both managed by a single platform" or why video surveillance customers terminate in the first place and why potential customers might avoid UAS's technology. Hon. Dau. Mot. at pp. 2-4. Those are facts (which presumably will be disputed by Honeywell at trial and not before as Honeywell has not moved for Summary Judgment on causation) that UAS witnesses such as Elkins and McGurk will testify to at trial.

[14] Only once in the last 15 years was Scherf fully excluded as an expert. In *Rosenberg v. DVI Receivables, XIV, LLC*, 2012 U.S. Dist LEXIS 196857 (S.D. Fla. Dec. 18, 2012) the court ruled Scherf was unable to "set forth the facts" or even "disclose the methodology" that he relied on in reaching his conclusions, nor was he able to quantify damages "within a reasonable degree of professional certainty." However, it is important to note that the Plaintiff failed to respond to the motion and Scherf was not aware of the motion until after it was granted. In another case, *Out-A-Sight Pet Containment, Inc v. Radio Sys. Corp.*, 2004 U.S. Dist. LEXIS 13256 (E.D. Pa. July 9, 2004), Scherf's testimony was limited, but he testified as an expert at trial. There the issue was the lack of underlying information due to the startup nature of the business. Here UAS is a mature business with historical operations on which Scherf can rely.

## III. Scherf's Methodology in Calculating Damages from the Loss of Existing Customers is Reliable and No Basis Exists to Exclude His Testimony.

The Third Circuit has interpreted the reliability requirement "to mean that 'an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable.'" *In re Actiq* at * 15 *(citing to Pineda*, 520 F.3d at 244 *(quoting In re Paoli,* 35 F.3d at 742.))*. In determining whether to admit expert testimony under Rule 702 the focus "must be solely on principles and methodology, not on the conclusions they generate." *CardioNet* at * 20 *(citing to Daubert*, 509 U.S. at 595). An expert's opinion is reliable under Rule 702 if it is based on "good grounds," that is, if it based on the methods and procedures of science. *Id. (citing to In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).

The Third Circuit has consistently cautioned that the reliability standard is "not that high" and is "lower than the merits standard of correctness." *Karlo v. Pittsburgh Glass Works, LLC,* 849 F.3d 61, 81 (3d Cir. 2017). The proponent of expert testimony does not "have to prove their case twice – they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In re DVI, Inc. Secs. Litig.*, No. 03-5336, 2013 U.S. Dist LEXIS 164199 at * 22 (E.D. Pa. Nov. 18, 2013) *(citing to In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 744)). Finally, the Federal Rules of Evidence "embody a strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact and for dealing with the risk of error through the adversary process." *CardioNet* at p. 20 *(citing to DeLuca v. Merrell Dow Pharm., Inc.*, 911 F.2d 941, 956 (3d Cir. 1990).

Honeywell sets forth four arguments attacking Scherf's methodology calculating damages for the Loss of Existing UAS Customers.[15] While Honeywell and its counsel dispute Scherf's methodology, the damages expert engaged by Honeywell did not. Baturka explicitly adopted Scherf's methodology and then, after making adjustments as necessary to reflect the errors and inconsistencies he had identified, Baturka opined to a reasonable degree of professional certainty that the amount of lost profit incurred by UAS as a result of the alleged breach was between $1,895,550 and $5,175,707.[16] This was Baturka determining the amount of but for damages that would place UAS in the same position it would have been but for the unexpected act (*i.e.* the breach by Honeywell). Baturka Dep. at pp. 69-70. Honeywell cannot now run away from the opinion of its own expert. The jury must be allowed to hear from Scherf and Baturka and decide whether the damages to UAS are $5,175,707, $15,498,122, or a number in between. *See Vapco, Inc. v. Perfecta Prods.*, No. 10-CV-399, 2011 U.S. Dist. LEXIS 161926 at * 3-4 (M.D. Fla. May 5, 2011) (Defendant's own experts agree with the methodology and opined only that Plaintiff's expert methodology was over simplified and/or overstated, not incorrect or unreliable.)

A)    **Scherf's Use of a Ten-Year Average life of a UAS Customer**
      **does not Render the Methodology Unreliable**

Federal courts applying the standards established by Rule 702 and 703 have permitted damages experts to make assumptions of fact necessary to render a sound opinion, so long as such assumptions have a reasonable basis in the available record and are disclosed to the finder of fact. *Brill v. Marandola*, 540 F.Supp. 2d 563, 568 (E.D. Pa. 2008). Courts have admitted expert testimony that incorporates or relies on an evaluation or interpretation of the record on the

---

[15] Hon. Dau. Mot. at pp. 5-19. While included under the heading of Scherf's methodology, it seems clear Honeywell's arguments are directed at the assumptions/ inputs for the analysis as opposed to the methodology itself.
[16] *See* Footnote 5.

grounds that it is the role of the expert to "assist the trier of fact to understand the facts already in the record." *Id.* (*citing to Total Control, Inc. v. Danaher Corp.*, 338 F.Supp. 2d 566, 570 (E.D. Pa. 2004).

The Third Circuit has held that "some factual basis" for an expert's testimony is sufficient to meet the "foundational requirement" for admissibility of expert testimony under the Federal Rules of Evidence. *Breedlove v. CSX Transp., Inc. (In re Asbestos Prods Liab. Litig)*, No. 09-cv-75120, 2011 U.S. Dist LEXIS 13087 at * 7 (E.D. Pa. Feb. 10, 2011) (*citing Stecyk v. Bell Helicopter Textron*, 295 F.3d 408, 414, 415 n.3 (3rd Cir 2002)). An expert is not required to base his or her opinion on independent data collection or field research. Rather, the question is whether the expert's data is of the type reasonably relied upon by experts in the particular field in forming opinions or inferences upon a subject, and whether there are good grounds to rely on this data to draw the conclusion reached by the expert. *Id.* at * 7-8 (*citing to Jaasma v. Shell Oil, Co.*, 412 F.3d 501, 514 (3d Cir 2005)).

This evaluation of the record includes reliance on information provided by the party who hired the expert; experts are not required to "eschew reliance on a [party's] account of factual events that the experts themselves did not observe." *Brill* at p. 568 (*citing to Tormenia v. First Investors Realty Co.*, 251 F.3d 128, 135 (3d Cir. 2000); *Robert Billet Promotions, Inc. v. IMI Cornelius, Inc.*, No. 95-1376, 1998 U.S. Dist. LEXIS 4235, at *12-13 (E.D. Pa. Apr. 1, 1998) (denying motion to exclude testimony of damages expert who "interviewed [the client] and reviewed documents produced in the course of this litigation").

Here, Honeywell devotes six pages to attacking the use of a ten-year average life of a UAS customer as in input in the Loss of Existing UAS Customer analysis.[17] This input is

---

[17] Baturka adopts the 10-year average life and ▆ attrition rate. Baturka Rep. Exhibit IIIA.

necessary for the calculation and could not and does not render the methodology unreliable. To perform the analysis, it was necessary to include an input for how long the average customer stays with UAS. Scherf Up. Rep. at p. 10. To derive this assumption/input,[18] Scherf had multiple conversations with the two people most knowledgeable at UAS – Elkins and McGurk – as to the proper input for the average life of a UAS customer. Both informed Scherf that the average was *in excess* of ten years. Scherff Up. Rep. at pp. 10-11, Scherf Dep. at pp. 73-78. Scherf also consulted with Barnes, the industry expert cited to and relied upon by Baturka, as to the average life of a customer in the industry and was informed it was seven to ten years. Scherf Dep. at p. 74. Scherf also reviewed data produced in the case to confirm that this 10-year average life of a customer was a reasonable assumption. Scherf Dep at pp. 74-82. Given that the data set was only lost customers (and thus excluded all current customers) and artificially assigned a 1999 start date for all those customers who had started with UAS prior to 1999 (thus understating the length of the relationship between UAS and its longest serving customers), Scherf was comfortable employing a 10-year average life of a customer in his analysis. Scherf Dep at pp. 74-78.

Scherf has done nothing more than what every expert does in every case. To perform the analysis, an average life of a UAS customer was required. The ten-year average is not the "lynchpin" of the damages model but rather only one input. To derive this input, Scherf talked to the people most knowledgeable at UAS (its President and Head of Sales), talked to a well-respected industry expert and reviewed data compilations that were of such a nature that simply calculating the average would not be appropriate due to the inherent data limitations that by

---

[18] Scherf is not opining as to the average life of a UAS customer. Elkins and McGurk will testify at trial as to the average life of a UAS customer.

definition would understate the average.[19] It was clearly appropriate for Scherf to have done so and this does not render his methodology unreliable. *See ActiveVideo Networks, Inc. v. Verizon Communs., Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (Defendant's disagreements are with the conclusions reached by Plaintiff's expert and the factual assumptions and considerations underlying those conclusions not his methodology. These disagreements go the weight to be afforded the testimony and not its admissibility*); In re Mushroom Direct Purchaser Antitrust Litig.*, No-06-0620, 2015 U.S. Dist. LEXIS 120892 at * 29-30 (E.D. Pa. July 29, 2015) (most contentions that expert's assumptions are unfounded go to the weight, not the admissibility, of the testimony and as a general rule the factual basis of an expert opinion goes to the credibility of the testimony not the admissibility.(internal citations omitted)).[20]

---

[19] Baturka's approach to calculating the average life of a UAS customer, in his calculation for the lower range, shows the fallacy of simply taking an average of the entries on Exhibit 58. Baturka's average of 5.4 was derived by excluding those customers with a start date of 1999 (thus excluding every customer whose duration was potentially understated) and then averaging the remaining entries which are only customers who have left UAS. Baturka Rep. at p. 10 n. 29.

[20] The cases cited by Honeywell are far afield and inapplicable to the situation presented here. In fact, they almost all concern revenue projections as opposed to other factually based inputs. In *ZF Meritor LLC v. Eaton Corp.*, 646 F.Supp. 2d 663, 667 (D.Del. 2009), the court excluded an expert where the core of his damages analysis was a one page estimate from a business plan prepared for a business formed within the year who source was both unknown to, and untested by the expert that produced damages in the range of $606 to $824 million. *Id* at pp. 667-668. In *Sterling v. Redevelopment Authority of the City of Philadelphia*, 836 F.Supp. 2d 251 (E.D. Pa. 2011), the court excluded an expert because the revenue projections were based on nothing more than optimistic speculation. *Id.* at p. 273. In *Benjamin v. Peter's Farm Condo. Owners Ass'n*, 820 F.2d 640 (3d Cir. 1987) the expert relied on the plaintiff's own personal belief as to his future earning capabilities. In *JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*, No. 97-0652, 1998 WL 175888 (E.D. Pa. Apr. 15, 1998) the expert used one and a half years of actual data (ignoring one year of data he did not find part of the trend) to project sales for a ten-year period and did nothing to bridge the gap between actual sales and projected sales. *Id.* at * 7-8. Here, the average life of a UAS customer is one input. The core of the methodology involved the review and analysis of thousands of lines of data related to lost RMR. Furthermore, the 10-year average life of a customer input was derived by obtaining the information from those at UAS who knew the average life of a customer, consultation with an industry expert and the review of data produced during the litigation. While Honeywell is free to contest the average life of a UAS customer input through cross-examination and their own expert (as they have done arriving at the

16

### B) Scherf's Methodology Accounts for the Loss of Customers Unrelated to the Honeywell Breach Through the Application of Historical Attrition Rates and Excludes Other Factors from a Damages Perspective

After quantifying the amount of RMR lost by customer after the assumed breach, multiplying that lost RMR by the remaining months for each customer and applying a 10- year average life per customer, Scherf applied an attrition rate of ▮▮▮▮▮▮▮ to remove lost RMR that was caused by factors other than the assumed breach. Scherf Up. Rep. at p. 11, Scherf Dep. at pp. 56, 110-114, 121-122. This ▮▮ attrition rate was UAS' historical attrition rate due to factors such as customers changing vendors, dropping service and going out of business. Scherf Up. Rep. at 11, Scherf Dep. at p. 51.[21] The application of UAS' historical attrition rate was required to remove from the damages calculation customers lost due to factors unrelated to the assumed breach. Scherf Up. Rep. at p. 11, Scherf Dep. at pp. 40-44. Furthermore, prior to the assumed breach, UAS' attrition rate was lower than the industry average but after the assumed breach it rose to above the industry average. Scherf Up. Rep. at p. 10.

Honeywell is just wrong that Scherf did not account for non-Honeywell related terminations and that his analysis assumes all customers who left did so because of Honeywell. Scherf built his analysis from the ground up by requesting and receiving by RMR line every Honeywell Raven analog customer who was lost after the breach. Scherf Up. Rep. at pp. 8-11, Exhibit 2, Scherf Dep. at pp. 103-4, 110-116. Scherf could conceivably have done the analysis on a gross basis and not done a line-by-line customer by customer analysis to isolate the lost RMR, but he can hardly be faulted for requesting and employing more granular data in his

---

figure of 5.4 years in Baturka's lower damage scenario) the use of a 10-year average life of a customer does not render the methodology unreliable.

[21] Baturka applied a historical attrition rate of ▮▮ and ▮▮ in his calculations. Baturka Rep. at pp. 8- 9. Again, any difference between the historical attrition rate applied by the two experts goes to the credibility/weight not the reliability of the methodology and admissibility.

17

analysis. *Id.* Once Scherf obtained the totality of lost RMR after the breach on a line-by-line customer by customer basis, he removed the historical attrition rate of ▓ from each individual customer RMR line to account for the amount of RMR that UAS would have expected to lose due to normal attrition. *Id.* Again, Scherf could have just tallied the lost RMR, arrived at the total and then applied the ▓ historical attrition to remove the non-Honeywell related terminations. *Id.*[22] But doing it on a line-by-line, customer by customer RMR basis leads to a more refined analysis and employs more granular data but arrives at the same result. *Id.* This was clearly an appropriate methodological approach[23] to remove the effect of normal attrition from those customers lost after the breach and thus isolate the lost RMR as a result of the assumed breach. Scherf Dep. at pp. 103-4, 110-116.

The fallacy in Honeywell's approach is its misunderstanding of recovering lost profits under Pennsylvania law. In meeting her burden of proof for lost profits, a plaintiff is required only to provide the fact finder with a reasonable amount of information so as to enable the fact finder to fairly estimate damages without engaging in speculation, and damages need not be proved with mathematical certainty. *Bolus v. United Penn Bank*, 525 A.2d 1215, 1226 (Pa. 1987). A claim for lost profits need only be supported by a reasonable basis for calculation. *James Corp v. North Allegheny School District*, 938 A.2d. 474, 494 (Pa. Commw. Ct. 2007). In assessing damages, particularly for lost profits, courts recognize the inevitability of some imprecision in the proof and note that certainty as to amount of damages is not required, particularly when it is the defendant's breach that has made such imprecision unavoidable. *Scully v. US WATS, Inc.*, 238 F.3d 497, 515 (3d Cir. 2001).

---

[22] This is how Baturka performed one of his analyses. Baturka Rep. at 9-10, Exhibit IIIB.
[23] Baturka adopted this same methodological approach. Baturka Rep. at Exhibit IIIA.

18

Here Scherf has used the available information and data to arrive at a calculation of UAS' lost profits.[24] He obtained granular level data, examined and considered that data, used his expertise and applied an appropriate methodology to control for normal attrition to isolate the lost RMR due to the assumed breach. This clearly passes muster under both *Daubert* and Pennsylvania law concerning the recovery of lost profits.

Furthermore, Honeywell completely ignores the various other steps taken by Scherf to isolate the effects of the assumed breach. Scherf analyzed the difference between the attrition rates in the un-impacted and the impacted time periods for the entire UAS business as well as the specific UAS Honeywell video business. Scherf Up Rep. at p. 10. The trend in the UAS attrition rate for its video business was compared to the UAS attrition rate for UAS' alarm business. Scherf Up. Rep. at p. 10. This comparison was performed to confirm that the increased attrition in the video business was related to the assumed breach and to rule out other potential causes such as company-wide issues or industry issues. Scherf Up. Rep. at p. 10. This analysis demonstrated that the assumed breach affected the video business and while the attrition rates and trends for alarm and video were similar in the non-impacted period, attrition in the video business increased in the impacted period while alarm did not. Scherf Up. Rep. at p. 10, Scherf Dep. at pp. 40-44. Furthermore, Scherf looked at available information, including the annual valuations performed by Barnes, which included analysis of economic and industry conditions as well as other economic trends and conditions. Scherf Dep. at pp. 40-44.

After reviewing, analyzing, and comparing the differences between the attrition rate trends for the un-impacted and impacted periods for UAS as a whole, UAS' video business and

---

[24] Honeywell complains that Scherf did not credit certain documents produced during the litigation. Hon. Dau. Mot. at pp. 11-12. Scherf can hardly be blamed for doing so when Honeywell's own expert decided not to factor them into his calculation due to their lack of accuracy. Baturka Rep. p. 9 n. 23.

UAS' alarm business and reviewing and analyzing economic and industry conditions, Scherf was unable to identify any other factor to explain the discrepancy other than the assumed breach. Scherf Dep. at pp. 41-44. Based on this extensive review of data and information coupled with Scherf's extensive valuation and damages experience, he will opine that, *based on his analysis*, the assumed breach led to the loss of customers. Scherf Dep. at pp. 40-44. No basis exists to exclude Scherf's testimony. *See Floorgraphics* at pp. 171-174 (The "before and after" method is recognized by experts in the field as an acceptable method to calculate lost profits, and where the experts analysis is based on the actual change in the Plaintiff's business it is admissible, even where later adjustments to the underlying assumptions may be required.); *Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 87 (1st Cir. 2017) (Expert is not required to eliminate every possible other cause and the fact that several causes might remain unelimimated only goes to the accuracy of the conclusion, not the soundness of the methodology); *Cummins v. Standard Register Co.*, 265 F.3d 56, 65 (1st Cir. 2001) (affirming admission of damages expert's testimony because "using specific variables would have resulted in a lower, and perhaps more accurate, figure...whatever shortcomings existed in [the expert's] calculations went to weight, not the admissibility, of the testimony"); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 794 (6th Cir. 2002) (In any event, in order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury).

## C) Any Data Discrepancies Have Been Rectified and Scherf's Updated Expert Report Employs the Same Methodology

During Scherf's deposition it was revealed that there may have been some discrepancies in the data. Scherf Dep. at pp. 107-108, 161-163. Scherf had understood that Exhibit 58 (an excel spreadsheet bates numbered UAS-HC-00005705.1 (support)) which was the source document for Scherf's Exhibit 2) contained only Honeywell Raven units. Ex. G (Exhibit 58). Scherf then

excluded alarm customers as well as customers that left UAS before 10/2014. Scherf Up. Rep. at p. 10 n. 25. The ▓▓ UAS Raven customers that had been customers for more than 10 years and left after 10/2014 were also excluded from the calculation due to the 10-year customer assumption. Scherf Up. Rep. at p. 10 n. 25. The remaining customers were included in Exhibit 2 and utilized in the Loss of Existing UAS Customers analysis.

Following Scherf's deposition it was determined that there were indeed non-Honeywell units included in Exhibit 58 and by extension Exhibit 2. Ex. H Affidavit of John Christie ("Christie Aff.") at ¶ 13. During the initial data pull that lead to the generation of Exhibit 58, some non-Honeywell units were inadvertently included. Christie Aff. at ¶ 14. The data included in Exhibit 58 was re-examined. Christie Aff. at ¶ 15. A review of each and every account on Exhibit 58 that was used in Scherf's Exhibit 2 was performed. Christie Aff. at ¶ 16. The data in Exhibit 58 that formed the basis for Scherf's Exhibit 2 was then compared to Exhibit 281 and any customers identified that did not have Honeywell Raven units were relabeled. Christie Aff. at ¶ 17. Then the remaining balance of accounts that did not cross references to Exhibit 281 were manually examined to confirm they were Honeywell Raven units. Christie Aff. at ¶ 18. Any units that were non-Honeywell were identified as such in the data set. Christie Aff. at ¶ 19. After conducting this review based on the books and records of the company and the best available information, any non-Honeywell units have been identified as such in the data set. Christie Aff. at ¶ 20. Scherf then used the updated spreadsheet to generate Exhibit 2 for his Updated Expert Report removing the non-Honeywell units from his analysis.[25]

---

[25] The criticisms set forth on p. 15 of Hon. Dau. Mot. flow from a fundamental misunderstanding of the data as opposed to any issues with the data itself. The data for Exhibit 281 (Ex. I ("Exhibit 281")) and Exhibit 58 was drawn from different sources because it is meant to represent two different things. Christie Aff. at ¶ 6. Per Honeywell's request, Exhibit 281 was organized by installation of machine per customer per location. Christie Aff. at ¶ 8. Exhibit 58 (and by

21

Based on the revised data and revised Exhibit 2, Scherf issued his Updated Expert Report. Scherf has not modified his methodology but rather simply employed the revised data that produced a reduced damages number of $15,498,122 as opposed to $16,619,714. In fact, this is exactly what Baturka did when modifying his opinion earlier in this same case. Thus, UAS requests that Scherf be allowed to amend his expert report (just as Baturka did) utilizing the revised data. *See ZF Meritor, LLC v. Eaton Corporation*, 696 F.3d 254, 295-300 (3rd Cir. 2012) (finding an abuse of discretion where the expert was not permitted to submit alternative damage calculations given the critical nature of the evidence and the consequences if permission to amend is denied.).

### D) Scherf's Expense Deduction is Warranted and Fully Supported

Both parties and both experts agree it is appropriate to deduct incremental costs that would have been necessary for UAS to service the customers that were lost due to the alleged breach. Scherf deducted ████████ and Baturka deducted ████████ Ex. J. ("Scherf Rebuttal Rep.") at p. 4. To arrive at his incremental cost calculation, Scherf ascertained the number of additional people who would have been required to service the customers who were lost due to the alleged breach. Scherf Up. Rep. p. 11, Scherf Dep. pp. 123-128. To arrive at the ████████

---

extension Scherf's Exhibit 2) was organized by RMR line per customer per location. Christie Aff. at ¶ 7. UAS has ██ different potential RMR lines it charges to its customers. Christie Aff. at ¶ 9. Thus, if a customer had 2 RMR lines (*i.e.* Raven Support and Raven Lease) that customer would appear once on Exhibit 281 but twice on Exhibit 58 (and by extension Scherf's Exhibit 2). Christie Aff. at ¶ 10. If a customer had 3 RMR lines (*i.e.* Raven Support, Raven Lease and Raven Watchdog) that customer would appear once on Exhibit 281 but 3 times on Exhibit 58 (and by extension Scherf's Exhibit 2). Christie Aff. at ¶ 10. Thus, it is perfectly logical that Scherf's Exhibit 2 contained ████████████████████ but Exhibit 281 contains only ██████ ████████████that ceased generating revenue during the damages period. Honeywell is attempting to compare apples and oranges without understanding the differences between the data contained in Exhibit 281 as opposed to Exhibit 58 (and by extension Scherf's Exhibit 2). Therefore, the arguments set forth on page 15 of Hon. Dau. Mot. are meritless.

Scherf used a ████████ fully loaded cost per person starting every six months after 2015. Scherf Up. Rep. at p. 11, Scherf Dep at pp. 123-128.

This was not some number picked out of thin air. Scherf, as is typical, standard and appropriate methodology, interviewed the people at UAS most familiar with these costs, which in this particular instance consisted entirely of additional people necessary to generate the revenues lost. Scherf Up. Rep. at p. 11, Scherf Rebuttal Rep. at p. 4, Scherf Dep at pp. 123-128. Scherf examined the central station and the Raven Departments at UAS's physical location, and it was clear that the only incremental costs required were the additional people necessary to service the lost customers. Scherf Dep. at pp. 125-126. Furthermore, Scherf had information as to certain people in the Raven department and the figures lined up for the additional people necessary to service the lost customers and Scherf was comfortable ████████ per person was the appropriate number. Scherf Dep. at p. 128.

Again, Scherf has done what every expert does in every case. His Loss of Existing Customers analysis requires an input for incremental costs. To ascertain that input, Scherff interviewed the people most knowledgeable at UAS as to what incremental costs would have been incurred. It was not possible to precisely calculate a number as UAS did not employ these people to service these lost customers. Scherff is not opining as to the exact dollar amount of the incremental costs that would have been incurred. Rather, UAS witnesses will testify at trial as to the incremental costs that would have been required to service the lost customers thus supplying the input necessary for the analysis.

No basis exists to exclude Scherf's testimony as damages experts are explicitly allowed to rely upon information provided by their clients and are not required to eschew reliance on their clients account of factual events that the experts themselves did not observe. *Brill* at p. 568,

*Billet* at * 12-13 (denying motion to exclude testimony of damages expert who interviewed [the client], and reviewed documents produced in the course of this litigation); *Montgomery v. Mitsubishi* at pp. 19-20 (because the accuracy of the data utilized by the expert witness is a matter that the jury, as fact finder in the case, is capable of considering, there is no basis to exclude the expert witness' report or testimony on the grounds that the information is not reliable).

### IV. Scherf's Methodology in Calculating Damages from the Loss of New UAS Customers is Reliable and No Basis Exists to Exclude His Testimony

To calculate damages from the loss of new potential customers, Scherf examined the actual growth rate of new customer RMR from 2008 until 2018 Q3 and assumed that, but for the breach, new customer RMR would have grown at the ███████ 2013 annual growth rate during the impacted period from 2014-2017.[26] Scherf Up. Rep. at p. 12. The delta between the expected new customer RMR and the actual new customer RMR was ██████ Scherf Up. Rep. at p. 12. Thus, comparing the historical performance in the unimpacted period with the actual performance in the impacted period resulted in ██████ in lost new customer RMR. Scherf Up. Rep. at p. 12. New customer RMR in 2017 was higher than in 2016 and 2018 continued this upward trend. Scherf Up. Rep. at p.13. These rates and trends were consistent with UAS only having a competitive IP video product/service from approximately November 2017, sourced through Open Eye, and UAS is now competing in the market.[27] Scherf Up. Rep. at p. 13. To

---

[26] Between 2007 and 2013 UAS' average annual RMR growth, a period that included the great recession, was ██████ Scherf Up. Rep. at p. 12.
[27] Again, Scherf is not opining as to whether UAS lacked an IP video product that met the needs of UAS and its customer. See Footnote 6.

convert the monthly lost RMR[28] into a lost profits damage amount, Scherf applied a valuation multiple of ███ Scherf Up. Rep. at p. 13. Therefore, the value to UAS of █ lost in new customer RMR is ███ and the value to UAS for a loss of ███ is ███ Scherf Up. Rep. at p. 13.

There is nothing unsound or unreliable about the methodology employed by Scherf to calculate this damage amount. To derive the growth rate going forward, Scherf examined the actual UAS growth rates from the unimpacted period (i.e. before the assumed breach) and selected a rather conservative ███ Scherf Up. Rep. at pp. 12. It is standard valuation/financial analysis practice to examine the unimpacted historical growth rate to derive the projected growth rate for the impacted period when performing a damages calculation. *See Packgen v. Berry Plastics*, 847 F.3d 80, 89 (1st Cir. 2017) (It is … common practice to estimate lost future profits by examining profits earned in the comparable past." (*citing Atlas Truck Leasing, Inc. v. First NH Banks, Inc.*, 808 F.2d 902, 904 (1st Cir. 1987); *Sec. & Data Techs., Inc. v. Sch. Dist. Of Phila.*, No. 12-2393, 2016 U.S. Dist LEXIS 175584 at *11 (E.D. Pa. Dec. 20, 2016) (the court remains convinced that the assessment of past profitability of an established business is a reliable basis for estimating lost profits and the expert's application of this methodology satisfied the requirements for admissibility); *Mountbatten Sur. Co. v. AFNY, Inc.*, 2000 U.S. Dist. LEXIS 4601 at * 49-51, (E.D. Pa. Apr. 11, 2000) (evidence of lost profits was admissible when it was based upon some prior profits and the testimony of the business principles.).

Then after deriving the delta ███ between the expected new customer RMR and the actual UAS new customer RMR during the impacted period, Scherf applied a valuation multiple

---

[28] New customer RMR is recorded as a single month of revenue in the month that the new customer starts paying even though customers typically sign a contract for three to five years with automatic renewals. Scherf Up. Rep. p. 13.

25

of ▮ to convert the monthly RMR revenue number into a damages number. This is a perfectly sound and reliable methodology. As Scherf testified, a valuation multiple such as the ▮ is an appropriate short cut to cash flow because it is a revenue multiple. Scherf Dep. at p. 202-212. The valuation multiple is an incremental value of cash flow because values of companies are based on cash flow and the valuation multiple is a discount to present value and it accounts for the present value risk adjusted for the RMR. *Id.* The valuation literature calls for the use of a valuation multiple precisely as Scherf employed it.[29] Scherf Dep. at p.207.

Honeywell's argument that it was inappropriate for Scherf to rely on the ▮ multiple from the Barnes valuation is meritless.[30] Experts are explicitly allowed to rely upon facts or data if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject. *CardioNet* at * 22 (*citing* Fed. R. Evid. 703). Scherf did not blindly adopt numbers for his analysis. Barnes is a well-respected and renowned expert in the security industry who had performed countless valuations in the security industry and numerous valuations for UAS and thus would be an appropriate person to rely upon for information. Scherf Dep. at p. 208. It was eminently reasonable for Scherf to review the valuations performed by Barnes (especially as they were done in real time and not as part of any litigation process) and the multiples employed therein, discuss those valuations and multiples as well as multiples used in the industry in general with Barnes, and then apply a ▮ multiple which was consistent not only

---

[29] Shannon P. Pratt Valuing a Business the Analysis and Appraisal of Closely Held Businesses at pp. 294-5 ("In a way, capitalization of revenues can be considered a shortcut to capitalization or earnings, since generally there is an implicit assumption that a certain level of revenue should be able to generate a specific earnings level in a given type of business.") attached hereto as Ex. K. *See also Floorgraphics* at p. 172 (noting Shannon Pratt's Valuing a Business as an authoritative source on the acceptable method to calculate lost profits).
[30] It is also disingenuous as Honeywell's own expert had no problem relying on information from the Barnes valuations as part of his analysis. Baturka Rep. at p. 4 n. 7, p. 10 n. 27.

with the UAS valuations but the security industry as well. Scherf Up. Rep. at p. 13, Scherf Dep. at p. 208.

Consulting the UAS valuations and the ensuing discussions with Barnes to help arrive at the 36.7 multiple does not render Scherf's methodology unsound or unreliable and no basis exists to exclude his testimony. *See Angelopoulos v. Keystone Orthopedic Specialists*, S.C., No 12-cv-5836, 2017 U.S. Dist. LEXIS 74102 at * 11-12 (N.D. Ill. May 16, 2017) (Expert permissibly relied on figures provided by Vice Chairman of CBRE, one of the largest commercial real estate brokers in the United States, who has participated in more than 3,000 lease transaction); *Main St. Mortg., Inc. v. Main St. Bancorp., Inc.*, 158 F.Supp.2d 510, 516 (E.D. Pa. 2001) (holding that expert Certified Public Accountant's use of capitalization rate that defendant objected to did not destroy the reliability of expert's opinions and that defendant was free to challenge expert's method for calculating loss profits through cross examination and through its own damages expert.); *Playtex Prods., Inc. v. P&G*, 2004 U.S. Dist. LEXIS 14084, at * 20 (S.D.N.Y. July 26, 2004) (finding expert opinion on lost profits to be admissible where expert had relied on party declarations and deposition testimony as well as documents from both parties.); *Wonderland Nurserygoods Co. v. Thorley Indus, LLC*, 2013 U.S. Dist. LEXIS 171399 at * 15 (W.D. Pa. Dec. 5, 2013) (Plaintiff maintains that accountants in the expert's field routinely rely on interviews with company personnel and defendant fails to raise any argument to the contrary and the court agrees. Defendant is left to challenge same with vigorous cross-examination and presentation of contrary evidence at trial…); *Constellation* at * 6-7 (Expert's use of penetration rates from an information management study in lost profits analysis was not improper).[31]

---

[31] Scherf is not relying on Barnes' hypothetical opinion about some matter generated during this litigation. Scherf is relying on a historical figure derived for a non-litigation generated process that is of record in the case to inform one input for his methodology. Experts in Scherf's field

**Scherf's Methodology for Calculating Re-Investment Costs of Existing Raven Analog Equipment is Reliable and No Basis Exists to Exclude His Testimony.**

Honeywell attacks Scherf's Re-Investment Cost of Existing Costs analysis again claiming Scherf is offering opinion which he is not. Scherf is not opining that "[t]he installed Honeywell Raven analog products had less value to UAS and its customers due to the assumed breach" or that the alleged breach caused UAS to "incur additional equipment and installation costs on certain of its existing customers."[32] Elkins and other UAS witnesses will testify to these facts. As of the assumed breach, UAS had invested significant dollars in its customer base relying on an expectation that proved to be false. Scherf Up. Rep. at p. 14. Scherf has attempted to quantify the damages that resulted from the need to replace certain Honeywell analog systems that it leased to customers sooner than it would have if Honeywell had not breached. Scherf Rep. at p. 13-14. In doing so Scherf has made assumptions based on the record evidence as he is explicitly permitted to do. The appropriate remedy for Honeywell is cross-examination - not exclusion.

---

reasonably rely on historical multiples derived for valuations. Thus, cases such as *American Key Corporation v. Cole National Corporation*, 762 F.2d 1569 (11th Cir. 1985) and *McLeod v. Dollar General*, No. 13-3113, 2014 WL 463492 (E.D. Pa. Sept. 16, 2014) have no application to this case. *Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp. 2d 558 (S.D. N.Y. 2007) actually disproves Honeywell's argument. The court noted the regression analysis at issue there was not a business record (like the Barnes valuations) in concluding it could not be relied upon. *Id.* at 666. Finally, *Legendary Art, LLC v. Godard*, No. 11-0674, 2012 WL 3550040 (E.D. Pa. Aug. 17, 2012) involved profit and loss projections of dubious origins where the expert had no familiarity with the methods or reasoning used to arrive at the projections. *Id.* at *1, 4. The dubious profit and loss projections of *Legendary Art* could not be more different than the Barnes valuations. The Barnes valuations cover dozens of pages, contain copious data compilations, financials, valuation analyses and market data etc. Ex. L (Exhibit 405). Not to mention, Scherff discussed the valuations with Barnes. *Legendary Art* and its dubious documents cannot be compared to the Barnes valuations and the case has no application to the facts presented here.
[32] Hon. Dau. Mot. at p. 23.

**VI.   Scherf Must be Allowed to Discuss UAS's Future Exposures Attributable to the Assumed Breach.**

Again, Honeywell misconstrues the opinions Scherf plans to offer at trial. As to the need to replace Raven analog equipment "early," Scherf explicitly says these amounts are not damages calculations but rather representative of an exposure UAS continues to face. Scherf Up. Rep. at p. 15.[33] Similarly, Scherf is not offering an opinion to a reasonable degree of professional certainty as to certain potential exposures because they cannot be quantified due to data limitations. Scherf Up. Rep. at p. 16. UAS witnesses will testify at trial that the assumed breach created a market reality in which UAS cannot and will never be able to integrate the Raven analog product installed in their customer base with an IP product in the manner in which it contracted with Honeywell. Scherf Up. Rep. at p. 16. It is reasonable to expect that this will have an additional negative impact on customer attrition but Scherf was unable to quantify it. Scherf Up. Rep. at p.16. Scherf did note that the impact to UAS as reflected in enterprise value at the end of 2017 based upon the declining valuation multiple was approximately ███████. Scherf Up. Rep. at pp.16-17.

Scherf does not currently anticipate opining to a reasonable degree of professional certainty that UAS suffered an additional ███████ dollars in damages. However, the analysis of the declining valuation multiple and its effect on the value of UAS is clearly probative of the harm caused by the assumed breach and Honeywell cannot prohibit Scherf from mentioning it as part of his testimony.

---

[33] Scherf can hardly be faulted for noting this exposure as Honeywell itself contemplated the need on the part of UAS to replace the installed Raven analog systems after it unilaterally decided not to complete Phase 3. Scherf Up. Rep. at p. 15 n. 37, n. 38, and n.39.

## VII.   Employee Costs Attributable to the Breach is a Compensable Damage

After the assumed breach in September of 2014, Honeywell stopped all future development of Phase 3 of the Integration Agreement. Due to Honeywell's failure to appropriately deliver Phase 2 and Phase 3 of the Integration Agreement, UAS was required to devote additional resources in the form of time spent by UAS personnel to rectify and service the issues that were to be but were not corrected. UAS quantified the additional time spend by certain employees on Honeywell Raven related analog challenges UAS was experiencing.[34]  This additional time spent by UAS employees was required because Honeywell failed to adequately complete the Integration Agreement.

Scherf was provided with Christie's testimony and Exhibit 282. Based on his review of those documents and his expertise in calculating incremental costs associated with the assumed breach (both of Phase 2 and Phase 3), he excluded all time for periods prior to the assumed breach and excluded the time spent by Elkins because the President of the company was more appropriately viewed as a fixed as opposed to incremental cost. Scherf Dep. at pp. 265-268, 283-285. Again, Scherf is not opining that the time set forth in Exhibit 5 is the amount of time the UAS employees spent after the breach dealing with Honeywell Raven analog issues and challenges. Those facts will be established by UAS witnesses at trial. Scherf took the information generated during discovery and calculated the damage to UAS controlling for what was an incremental as opposed to a fixed cost and adjusting the amounts to correspond to the damage period as it was perfectly appropriate for him to have done.

---

[34] Ex M (Christie Dep. at pp. 56-75) and Ex N (Exhibit 282).

Dated: March 1, 2019

RHOADES LLC

By:     MARK L. RHOADES, ESQUIRE
Attorney ID No. 80641
mrhoades@rhoadesllc.com
1528 Walnut Street, Suite 1650
Philadelphia, PA 19102
215-496-9002 T
215-893-3960 F

and

THE JACOBS LAW GROUP

/s/ Joseph M. Profy
Attorney ID No. 77141
Joseph M. Profy, Esquire
jprofy@jacobslawpc.com
2005 Market Street, Suite 1120
Philadelphia, PA 19103
215-569-9701 T
215-569-9788 F

Attorneys for Plaintiff,
Universal Atlantic Systems, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNIVERSAL ATLANTIC SYSTEMS,

                    Plaintiff,

v.

HONEYWELL INTERNATIONAL INC.,

                    Defendant.

Case No. 17-4660

**DECLARATION OF JOESPH M. PROFY
IN OPPOSITION TO DEFENDANT HONEYWELL INTERNATIONAL INC.'S
MOTION TO EXCLUDE TESTIMONY OF STEPHEN SCHERF
PURSUANT TO DAUBERT V. MERRELL DOW PHARMACEUTICALS, INC.
WITH EXHIBITS A-N**

# FILED UNDER SEAL

CONTAINS DISCOVERY MATERIAL MARKED HIGHLY CONFIDENTIAL OR CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

## CERTIFICATE OF SERVICE

I, Joseph M. Profy, hereby certify that on March 1, 2019, I caused a true and correct copy

of the foregoing Plaintiff Universal Atlantic Systems, Memorandum of Law in Opposition to

Defendant Honeywell International, Inc.'s Motion to Exclude the Expert Testimony of Stephen

Scherf upon the following counsel of record by electronic mail as follows:

Kevin E. Hexstall, Esquire
Marshall Dennehey Warner
Coleman & Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103
Kehexstall@mdwcg.com

Mark L. Johnson
Greene Espel PLLP
222 S. Ninth Street, Suite 2200
Minneapolis, MN 55402
Mjohnson@greeneespel.com


Dated: March 1, 2019

*/s/ Joseph M. Profy*
JOSEPH M. PROFY ESQ.
**JACOBS LAW GROUP, P.C.**
2005 Market Street, Suite 1120
Philadelphia, PA 19103
215-569-9701 (T)
215-569-9788 (F)
jprofy@jacobslawpc.com

1