**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNIVERSAL ATLANTIC SYSTEMS, INC.,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| | **NO. 17-4660** |
| **HONEYWELL INTERNATIONAL, INC.,** | |
| **Defendant.** | |

## OPINION

This case presents a straightforward legal question, one with which any first-year law student would be intimately familiar: Did the parties form a binding contract? As many a first-year law student can attest, however, answering that question—applying the law to actual facts—can be anything but straightforward, as this case illustrates. Plaintiff, Universal Atlantic Systems, Inc. ("Universal"), claims that it formed an implied-in-fact contract with Defendant, Honeywell International, Inc. ("Honeywell"), based on a series of meetings and communications between the parties in early 2014, and that Honeywell breached the terms of that agreement. Honeywell disputes those claims, arguing it did not breach any implied-in-fact contract because no such contract was formed. Honeywell also asserts a crossclaim, arguing Universal breached a separate agreement between the parties in 2016. Honeywell now moves for summary judgment on Universal's implied-in-fact contract claim as well as on its crossclaim. For the reasons that follow, Honeywell's motion will be granted on both claims.

I.      Facts[1]

A. The Parties & Their Business Relationship

At all times relevant here, both Universal and Honeywell were in the video-surveillance

---

[1] The following facts come from the record and are not disputed by the parties.

business.  Honeywell developed and sold video-surveillance equipment, including both hardware in the form of video recorders—*i.e.*, security cameras—and software that ran on those video recorders.  Universal purchased video-surveillance equipment from Honeywell, amongst other vendors, and then sold or leased that equipment to large, multi-location companies such as McDonald's and Panera Bread.

Although Universal was one of the largest purchasers of Honeywell's security equipment in the country, prior to 2013, Universal purchased hardware from Honeywell at prices agreed upon through informal discussions between Scott Elkins, Universal's President, and Scott Harkins, the Honeywell executive that managed the Universal relationship for several years.  In November 2013, however, the parties executed a written agreement that set a fixed price for Universal's purchase of Honeywell's video recorders.[2]

### B.  Move from Analog to Digital

A catalyst of this dispute was the video-surveillance industry's transition from analog to digital technology over the last decade.  Up until the mid-2000's, the dominant video-surveillance technology was digital video recorders ("DVRs").  Despite the name, DVRs were analog technologies, not designed to be connected to the internet.

In the 1990s, Honeywell developed and began selling its Rapid Eye line of DVRs as well as a suite of software services related to the hardware.  Those services included Rapid Eye Report ("RER"), which collected data from Rapid Eye DVRs and created customizable reports for end users, and "Admin/View," which allowed end users to remotely administer and view Rapid Eye DVRs.

Universal purchased thousands of Rapid Eye systems, and then sold or leased those

---

[2] The precise terms were that Universal would pay $2,100 for each 16-channel analog video recorder, and $1,840 for each 8-channel analog video recorder.

systems to its customers. Honeywell also "private-labeled" Rapid Eye DVRs and related software under Universal's Raven branding. The private-label arrangement was not exclusive; Honeywell private-labeled Rapid Eye DVRs for other purchasers, and Universal purchased Raven-branded video recorders from other producers, albeit of a different quality than Honeywell's Rapid Eye.

By the late 2000s, however, the proliferation of internet technology caused a shift in video-surveillance technology. Analog DVRs were replaced with network video recorders ("NVRs"), which had the capability of connecting to computer networks or the Internet. In 2010, Honeywell developed and began selling an internet-based surveillance system under its "MaxPro" brand, which included MaxPro NVRs and MaxPro-branded software such as the MaxPro Video Management System ("MPVMS").

Honeywell's transition from analog Rapid Eye DVRs to MaxPro NVRs created several, interrelated problems for Universal. First, because the Rapid Eye DVRs operated on different end-user software than did the Max Pro NVRs, if customers transitioned to the new video-recorder technology, they would also need to transition to new end-user software or else maintain separate software platforms. Second, and relatedly, the new MPVMS end-user software differed in critical respects from Rapid Eye's Admin/View software, making a transition potentially disruptive for Universal's customers. Finally, as Honeywell ramped up production of MaxPro NVRS, it wound down production of Rapid Eye DVRs, leaving Universal without an adequate supply of equipment and parts for customers still employing the legacy technology.

### C. Discussing Solutions

The parties were aware of the challenges the transition from analog to digital equipment

posed to Universal and the Universal-Honeywell relationship.  In February 2011, in an email from Yves Van der Elst—a Honeywell engineer on the Universal project—to Harkins, Elkins, and Brian Walker—Universal's Director of Raven technology—Van der Elst explained that Honeywell had "no plan to obsolete [the Rapid eye] Admin/View [platform] before our customers are ready to transition to the MPVMS based solution."  Van der Elst continued: "I have no idea how we will transition from Admin/View to MPVMS based solution.  We may want to deploy both solution in parallel. . . .  The bottom line is this is not a Honeywell decision but a UAS one!  We will present you with options and we will work together on the implementation."

In October 2012, the issue of separate software platforms remained outstanding.  In an email from Universal's Walker to Harkins, Walker observed that one of the "open issues" in the Universal-Honeywell relationship was the "[m]ultiple distributed database architecture" caused by the new MaxPro NVRs.  Walker requested Honeywell "[p]rovide an integrated solution between Admin/View, RER, Dashboard, MVMSs and MaxPro to support the require[d] infrastructure . . . ASAP."

The parties engaged in discussions about a solution into 2013.  In an email dated February 6, 2013 from Walker to Van der Elst, Walker emphasized the "need to focus on [a] Single Sign on, centralized user management/control—MaxPro and Raven Devices."  Walker further noted the need "to accelerate these issues so we [Universal] are not left behind or forced to find other solutions to meet our customers' demands (i.e. Oz, other IP solutions)."  On April 23, 2013, Harkins sent an email to Elkins explaining: "We [Honeywell] have been working on a comprehensive plan to outline in writing a complete [Universal] plan that would include" a "[l]ong term roadmap for Raven transition to next generation of product."

### D. 2014 Roadmap & Communications

The parties' plans to develop a solution for Universal accelerated in early 2014. On February 27, 2014, Van der Elst shared a PowerPoint presentation with Universal entitled "UAS MaxPro VMS Clip & Email Get Well Plan" (the "Get Well Plan"), which laid out a "Roadmap" for the future of the Universal-Honeywell relationship. The opening slide of the Get Well Plan defined the problem faced by Universal as follows: Universal wanted to add "about 1200 sites in MAXPRO," and faced issues rolling out that quantity of equipment. To solve that problem, the Get Well Plan proposed "deploy[ing] a new version of [Honeywell's] MAXPROVMS" for Universal.

The next slide provided a "[s]ummary" of Honeywell's "[d]eliverables" for Universal broken out into three phases and accompanied by a timeline. Phase One identified several completed projects relating to Universal's existing analog system. According to the slide, Honeywell had completed all Phase One projects as of January 2014. Phase Two identified Honeywell projects "[i]n [p]rogress" or "[i]n [d]esign," and summarized potential upgrades to Universal's existing analog system software. The slide indicated that "[i]n [p]rogress" projects were to be delivered by March 14, 2014, and "[i]n [d]esign" projects were to be delivered by May 14, 2014. Finally, Phase Three identified Honeywell projects "[i]n [d]efinition". Amongst the projects included as part of Phase Three was the creation of an "[i]ntegrated [m]anagement" system for "VMS, RER, [and] Admin/View"—that is, Honeywell's various software platforms. The timeline for Phase Three projects was "Q3 14," understood to mean the third quarter of 2014.

On March 19, 2014, Honeywell's Harkins sent Elkins a follow-up email, with the subject line "Roadmap." Harkins stated that he had "received a complete and very detailed review from

our technical staff on the transition path from [Universal's] current RAVEN solution to a next generation solution that does not leave your existing customers stranded." Harkins explained that the update "was very engineering focused" and that it was "being updated in a way that will be more externally presentable." Harkins then asked to set up a meeting to "review" the update "in detail." Harkins and Elkins set up a meeting for April 14.

Although not entirely clear,[3] at the April 14 meeting Honeywell appears to have shared two PowerPoint presentations with Universal's leadership—one entitled "[Universal] Transition to MAXPRO" and the other entitled "[Universal] Raven Transition Plan Proposal." Both presentations concerned Universal's transition to a new surveillance system based on Honeywell's MAXPRO software, and both included a slide entitled "MAXPRO Cloud Architecture" that mapped out Honeywell's surveillance software with a graphic labeled "Single Sign On" positioned in the middle of the map. The "[Universal] Raven Transition Plan Proposal" also incorporated the deliverables summary slide from the Get Well Plan—the slide with deliverables broken out into three phases and accompanied by a timeline. The "[Universal] Transition to MAXPRO" presentation, however, included a "[s]ummary" of "[Universal] [d]eliverables" slide referencing only Phases One and Two of the Get Well Plan.

On April 25, 2015, Honeywell's Harkins sent Elkins a follow-up email with the subject line "Development Dates." Given the importance of the communication to the dispute at hand, the email is reproduced below in its entirety:

> I apologize for the delay in sending this data over. I wanted to be certain that engineering had a well thought out and executable plan and long term development vision.
>
> The attachment provides some guidance on deliverable dates on our current

---

[3] The parties represent that two PowerPoint presentations dated April 14, 2014 were produced in discovery. Elkins testified that he "believe[d] to have received both of [the presentations]," but could not confirm "without supporting email showing me when I received it."

RAVEN projects. This highlights the near term developments over the next 90-120 days.

The project that was discussed on the call was effectively 3 large phases. The first phase is complete and deployed within the [Universal] environment. The second phase is nearing completion and will deploy on the staging servers by the end of May. After testing and approval from Brian [Walker], assuming no major challenges it would likely be deployed into the [Universal] production environment in July and possibly sooner.

Phase 3 is the project that provides [Universal] the greatest benefits and timing is not discussed on this slide, I believe this is your most critical question and need. The Phase 3 portion will be developed in sprints with ongoing releases that can begin by the end of September and will likely continue over the course of several quarters. I have asked Yves [Van der Elst] to work with Brian on a clear set of priorities on the deliverables for each of these development sprints and then test the priorities against development timing and build out a development schedule. We will then make decisions on time versus priorities and come to agreed release dates. This is where all of our discussion over the past 2.5 weeks has centered. Yves will begin this process with Brian today though I believe they have had these discussion informally multiple times.

The attachment simply calls out the Phase 1 and Phase 2 dates, both important, but these are not the development that moves [Universal] to the next generation. It is very important that Yves and Brian are in complete alignment on the phase 3 development cycle.

I have only attached the timing slide from our presentation, let me know if you would like the entire deck (very large file) and I will send it over.

The PowerPoint attached to Harkins' email concerned only Phases One and Two.

On April 30, Elkins responded to Harkins' email:

Phase 1 and 2 are pretty clear. The issue in Phase 3. Without any sense of real deliverables and a meaningful timeline, I am not feeling great as it relates to where we are or where we are going. If Yves [Van der Elst] knows where we need to be, he should be able to back into some hard targets (for deliverables) and some timelines that we can rely upon. While I believe that at you and your team are well intending, I will need some more "meat" around Phase 3 to feel comfortable.

I am hopeful that you can provide a more meaningful game plan in the next week or so. We feel as if we are at a crossroads.

There is no evidence in the record that the parties had further discussions on the Roadmap after

April 30.

Universal claims that as of April 25, 2014, an implied-in-fact contract existed between the parties, in which Honeywell promised to complete the software development projects identified in Phase Three of the Get Well Plan. As to Universal's obligations, Elkins testified that:

> [Universal] provided resources for – in terms of human capital, meaning [Walker], myself and others would participate in sessions as to what the software would look like, what it needed. We would bring customers to Honeywell's facility so they could get the voice of the customer, what they called VOC. . . . Honeywell used our RAVEN experience as their platform for delivering this product and these products to the market in general.

In addition, Universal would "purchase from Honeywell all hardware to meet its customers' demands and [Universal] would continue to purchase Raven products from Honeywell going forward."

### E. September 22 Meeting

In mid-2014, the leadership of Honeywell's video security business changed. Harkins moved to a different division within the company around May, and Inder Reddy, Harkins' successor, was not officially appointed until September. In the interim, Michael Trilk, a Honeywell sales manager who had not been part of the earlier discussions on the development of new software for Universal, assumed responsibility for managing the relationship with Universal.

The change in management precipitated a change in Honeywell's commitment to the Roadmap laid out in the Get Well Plan. As Trilk explained in an email to Keith Bard, a supervisor at Honeywell:

> Last year, Honeywell committed to a three phase plan to deliver what [Universal] needed moving forward. We have delivered phase one. We are delivering phase two next week, QA testing will take place in a live environment until

approximately 10/31/14. Phase Three was mostly forward looking thinking additions and no drop dead delivery date was ever agreed to. After examining the true costs associated with developing phase one and phase two, coupled with losses we have experienced maintaining the current [Universal] solution, we have no plans to continue with phase three under the current operating procedures. . . .

Trilk met with Elkins at an event in June 2014. According to Trilk, Elkins told him that there was an agreement between the parties in which Honeywell promised to build software for Universal. Honeywell employees familiar with the earlier discussions told Trilk that no such agreement existed.

On September 22, 2014, Trilk met with Elkins to discuss the future of the parties' relationship. Trilk informed Elkins that Honeywell would complete the deliverables identified in Phases One and Two of the Get Well Plan, but that Honeywell would not pursue any of the Phase Three projects. Universal claims that the September 22 meeting constituted a breach of the implied-in-fact contract between the parties.

## F. Post-September 22 Meeting and Rapid Eye End of Life

Following the September 22 meeting, Universal continued to purchase Rapid Eye DVRs under the terms of the 2013 agreement. In January 2015, Honeywell informed Universal that it planned to discontinue or "end of life" the Rapid Eye product line by the end of the year. On May 7, 2015, Honeywell publicly announced Rapid Eye's end of life.

On June 2, 2015, Elkins sent Reddy an email memorializing a May 19 meeting between the parties. As Elkins explained in the email, Honeywell's decision to end of life the Rapid Eye product line put Universal in a bind. Based on the limited availability of certain parts, Honeywell could not manufacture enough Rapid Eye DVRs to meet Universal's demand. The parties discussed possible contingency measures to limit the impact on Universal's customers, including purchasing parts to manufacture Rapid Eye DVRs for Universal.

On November 12, 2015, following months of discussions about a potential global settlement between the parties, Honeywell's Trilk emailed Elkins as follows:

> [M]ore and more of the Raven parts are becoming obsolete. I don't want our discussion to slow the production of the 1350 units. We can make a last-time-buy to secure what is needed for the 1350 units we have proposed, but just need to know you are committed to taking all 1350 units.

Elkins responded that day:

> I am confused by your email.
>
> Inder [Reddy, of Honeywell] assured me that nothing about our ongoing discussions would derail his commitment to provide the 1350 (might have been 1250 at that time) raven units. As you are very well aware, I have asked Honeywell (for a very long time) to secure as many of these parts as possible and to do so immediately. The fact that 'more and more of the raven parts are becoming obsolete' is a great concern in that these parts have not already been secured. I remain at a complete loss as to why Honeywell has not secured as many of these parts as possible. Why is Honeywell waiting? We have clearly expressed our desire to secure these Raven units.

Trilk forwarded Elkins response to Reddy with the note: "[Universal] is committed to taking all 1350." Elkins later testified that he had promised to purchase Raven units on behalf of Universal from Honeywell in late 2015. The units were to be purchased under the terms of the 2013 pricing agreement.

Based on the November 12 email exchange, Honeywell purchased $176,875 worth of components for manufacturing Raven DVRs. As Elkins testified, while Universal thereafter purchased some Raven DVRs from Honeywell, it did not buy "anywhere close to 1,350." Today, Honeywell holds parts and finished goods sufficient to supply 728 16-channel Raven DVRs and 30 8-channel Raven DVRs to Universal.

### G. Universal's Relationship with Other Suppliers

While Universal bought the bulk of its security-equipment from Honeywell, starting in 2012, Universal also bought and installed Raven-branded systems from OzVision, and, in

September 2013, opened discussions with OpenEye—both manufacturers of video-surveillance equipment. As Elkins explained in an email to Richard Sheppard, the CEO of OpenEye, dated September 13, 2013, Universal was "looking to partner with a company that truly 'gets it' relative to the way in which we deliver video services through our Raven System." On November 18, 2013, Elkins and Sheppard met to discuss a "Product Strategy" report prepared by OpenEye for Universal that included a proposed "next generation recorder [software] platform." The Product Strategy report proposed delivering the platform to Universal by September or October 2014. On November 25, 2013, Universal and OpenEye executed a mutual nondisclosure agreement "to explore a possible business relationship." By February 2014, OpenEye was working on a software platform under Universal's Raven brand, called Raven IP. In an email to a third-party, Elkins stated that he was working with OpenEye because "I can't take it anymore" with Honeywell.

On March 26, 2014, Universal ordered its first security system from OpenEye. On April 28, 2014, Elkins told a customer that OpenEye was "the back end for Raven 2.0 IP." In May 2014, Universal began shopping Raven IP products to customers, including McDonalds' and Panera Bread. On September 22, 2014, Universal closed the sale of an OpenEye Raven IP system to one of its largest franchise customers. Universal installed the first Raven IP system the next day. Universal continues to purchase Raven IP systems from OpenEye to this day.

## II.    Procedural History

Universal filed this suit on October 18, 2017, bringing claims against Honeywell for breach of contract, intentional interference with contractual relations, negligent misrepresentation, and promissory estoppel. Honeywell moved to dismiss the claims, and the Court granted the motion as to all counts but the breach of contract claim. On May 3, 2018,

Honeywell filed its answer to the remaining claim as well as a crossclaim against Universal for breach of contract.

Now pending are: (1) Honeywell's motion for summary judgment as to both Universal's breach of contract claim as well as Honeywell's crossclaim; (2) Honeywell's motion to exclude the testimony of Universal's proposed damages expert; (3) Universal's motion for sanctions for spoliation; and, (4) Honeywell's motion to strike the declaration of Richard Sheppard.

### III.    Legal Standard

Summary judgment must be granted to a moving party if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Alabama v. North Carolina*, 560 U.S. 330, 344 (2010). Material facts are determined by reference to the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute "exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *U.S. ex rel. Greenfield v. Medco Health Solutions, Inc.*, 880 F.3d 89, 93 (3d Cir. 2018).

### IV.    Discussion

Where, as here, a federal court has authority to hear a suit by virtue of diversity jurisdiction, the court must apply state substantive law. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). "'Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (quoting *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999)).[4] Pennsylvania law further provides that "where the facts are in dispute, the question of whether a contract was formed is for the jury to decide." *Ecore Int'l, Inc. v.*

---

[4] Both parties acknowledge that Pennsylvania law governs this dispute.

*Downey*, 343 F. Supp.3d 459, 487 (E.D. Pa. 2018) (quoting *Ingrassia Constr. Co. v. Walsh*, 486 A.2d 478, 482 (Pa. Super. 1984)). "However, '[t]he question of whether an undisputed set of facts establishes a contract is a matter of law.'" *Id.* at 487-88 (quoting *Mountain Props., Inc. v. Tyler Hill Realty Corp.*, 767 A.2d 1096, 1101 (Pa. Super. 2001)); *see also Legendary Art, LLC v. Godard*, 888 F. Supp.2d 577, 585 (E.D. Pa. 2012) ("The question of whether an undisputed set of facts establishes a contract is typically one of law, but where the facts are in dispute, the question is for the jury to decide.").

Here, there are no material disagreements as to what occurred between the parties; rather, Honeywell and Universal disagree as to the legal consequences of those actions—specifically, whether the series of interactions and communications between the parties formed binding contractual agreements.

## A. Universal's Contract Claim

Universal contends that the communications and interactions between it and Honeywell during early 2014 created an implied-in-fact contract between the parties. According to Universal, Honeywell agreed to develop software as described in Phase Three of the Get Well Plan in exchange for Universal's assistance in the development of that software and a commitment from Universal to purchase from Honeywell all hardware to meet its customers' demands. Universal further argues that Honeywell breached the agreement as of September 22, 2014, by repudiating its promise to complete Phase Three. Honeywell counters that there was no breach because there was never any contract. The issue then is whether an implied-in-fact contract was formed.

"A contract implied in fact has the same legal effect as any other contract. It differs from an express contract only in the manner of its formation." *Ingrassia*, 486 A.2d at 483 n.7.

Whereas "[a]n express contract is formed by either written or verbal communication[,] [t]he intent of the parties to an implied in fact contract is 'inferred from their acts in light of the surrounding circumstances.'" *Id.* (quoting *Cameron v. Enyon*, 3 A.2d 423, 424 (Pa. 1939)). As with all contracts, however, an implied-in-fact contract exists only if "the parties . . . agree upon the material and necessary details of the bargain," *Lombardo v. Gasparini Excavating Co.,* 123 A.2d 663, 666 (Pa. 1956), and the agreement is supported by adequate consideration, *Thomas v. R. J. Reynolds Tobacco Co.*, 38 A.2d 61, 63 (Pa. 1944).

Honeywell is entitled to summary judgment as a matter of law on Universal's implied-in-fact contract claim because the undisputed facts establish that the parties never manifested a mutual intent to be bound to the material terms of the bargain.[5] "It is well settled that in order for an enforceable agreement to exist, there must be a 'meeting of the minds,' whereby both parties mutually assent to the same thing, evidenced by an offer and its acceptance." *Mountain Props.*, 767 A.2d at 1101. For an implied-in-fact contract, the moment of "[o]ffer and acceptance need not be identifiable and the moment of formation need not be pinpointed." *Ingrassia*, 486 A.2d at 483. Instead, "the intention to [incur] obligation is inferred from the conduct of the parties in light of surrounding circumstances including a course of conduct." *Buzzmarketing, LLC v. Upper Deck Co. LLC*, 2004 WL 966241, at *4 (E.D. Pa. May 6, 2004) (quoting *Highland Sewer & Water Auth. v. Forest Hills Mun. Auth.,* 797 A.2d 385, 390 (Pa. Commw. 2002)); *see e.g.*, *Lobar, Inc. v. Lycoming Masonry, Inc.*, 876 A.2d 997, 1001 (Pa. Super. 2005) (finding "the record seems to reflect that the parties' course of dealing established" an implied-in-fact contract where evidence showed defendant "signed almost identical contracts with [p]laintiff in the past"). "In ascertaining the intent of the parties to a contract, it is their

---

[5] Because Honeywell is entitled to summary judgment on this ground there is no need to reach Honeywell's argument that the contract is unenforceable for lack of consideration.

outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." *Ingrassia*, 486 A.2d at 483.

Here, the record establishes that the parties' communications and conduct did not establish an objective manifestation of assent on the part of Honeywell or Universal to abide by the purported terms of the agreement.

### 1. Parties' Communications

The parties' communications demonstrate that, while Honeywell and Universal discussed a plan to address the challenge posed by changing surveillance technology, they never reached a final, binding agreement as to what that plan would entail. As late as April 30, 2014—a point at which Universal claims a binding contract had already been formed—Universal's Elkins expressed his unease with the Phase Three proposal in an email to Harkins, explaining "[w]ithout any sense of real deliverables and a meaningful timeline, I am not feeling great as it relates to where we are or where we are going." Elkins continued: "I will need some more 'meat' around Phase 3 to feel comfortable. I am hopeful that you can provide a more meaningful game plan in the next week or so. We feel as if we are at a crossroads." There is no record evidence of any subsequent communication between Elkins and Harkins—or, for that matter, between Elkins and any other Honeywell employee—addressing Elkins' stated discomfort with the path forward on Phase Three.[6]

---

[6] Universal suggests that further communications could have occurred over the phone or in person. However, even though Universal deposed both Elkins and Harkins, neither testified that such a discussion occurred, and "[b]are assertions, conclusory allegations, or suspicions will not suffice" to overcome a summary judgment motion. *D.E.* v. *Cent. Dauphin Sch, Dist*., 765 F.3d 260, 268-69 (3d Cir. 2014).

Universal also argues that the lack of such evidence is due to spoliation because Honeywell did not preserve Harkins' emails when he switched laptops sometime in 2014, and did not preserve Elkins' emails when he left the company in 2016. The party asserting spoliation of evidence bears the burden of establishing that "the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.* 665 F.3d 68, 73 (3d Cir. 2012); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93,

Universal responds by pointing to Harkins' April 25 email—where Harkins told Elkins that the "Phase 3 portion will be developed in sprints with ongoing releases that can begin by the end of September and will likely continue over the course of several quarters"—arguing that the email establishes a mutual intent to be bound. The argument is unavailing for three reasons. First, as Harkins acknowledged in the April 25 email, "critical question[s]" remained outstanding regarding Phase Three, including what the software system would look like, how it would operate, or when it would be delivered. Second, as discussed above, Elkins' April 30 response expressing unease over the lack of "real deliverables" for Phase Three undercuts Universal's argument that the parties reached a binding agreement as of April 25, 2014. Read together, the April 25 and 30 emails demonstrate that critical issues remained outstanding with regard to the Phase Three proposal, and as such, the communications fall short of establishing that "both parties mutually assent[ed] to the same thing." *Mountain Props.*, 767 A.2d at 1101.

Third, and finally, even crediting Honeywell's argument that in the April 25 email Harkins agreed to a term of the future contract—namely, when the project would commence— that alone "cannot be construed as an implied-in-fact contract because [a] term alone, in the absence of manifested agreement as to any other material term of the contract . . . is insufficient to create an enforceable contract for services." *Buzzmarketing*, 2004 WL 966241, at *4. As noted, "critical question[s]" remained outstanding regarding Phase Three, demonstrating that

---

107-08 (3d Cir. 2001). Universal has not sufficiently shown that "there has been actual suppression . . . of evidence." *Bull*, 665 F.3d at 73. Because "actual suppression" does not occur where "the destruction was a matter of routine with no fraudulent intent," the party asserting spoliation must demonstrate the opposing party acted with bad faith. *Id.* at 79. Here, Universal concedes that Honeywell did not act with bad faith in failing to preserve Harkins' and Elkins' emails; rather, the emails were destroyed in the ordinary course of business. *Id.*; *see also Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) ("[W]here a party has a long-standing policy of destruction of documents on a regular schedule, with that policy motivated by general business needs, which may include a general concern for the possibility of litigation, destruction that occurs in line with the policy is relatively unlikely to be seen as spoliation."). Thus, Universal has failed to establish spoliation has occurred, and its motion for sanctions will be denied accordingly. *Bull*, 665 F.3d at 73 n.5 (explaining that a court must determine whether spoliation occurred before determining whether sanctions are appropriate).

"the parties themselves [had not] agree[d] upon the material and necessary details of the bargain." *Lombardo*, 123 A.2d at 666; *Bethlehem Steel Corp. v. Litton Indus., Inc.*, 488 A.2d 581, 591 (Pa. 1985) (finding no contract formed where "the parties left open what amounted to gaping holes in a multi-million dollar contract. . . .").[7]

Accordingly, while Universal and Honeywell's communications set out the parameters of what a future agreement might look like, those communications never amounted to more than "mere statement[s] of an aspirational goal to reach some future agreement." *Ecore Int'l*, 343 F. Supp.3d at 490 (quoting *Reynolds Packaging KAMA, Inc. v. Inline Plastics Corp.*, 2011 WL 5089500, at *8 (M.D. Pa. Oct. 25, 2011)). Such "preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract." *Channel Home Centers, Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 298 (3d Cir. 1986).

### 2. Parties' Conduct

Moving from the parties' communications to their conduct, neither Honeywell nor Universal acted as if they were bound to follow through with the purported terms of the agreement. *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 552 F. Supp.2d 515, 526 (E.D. Pa. 2008) (holding "the parties' conduct does not manifest mutual assent because there is no evidence that either party's conduct conformed to a number of the essential terms of the purported contract"); *Buzzmarketing*, 2004 WL 966241, at *4 (finding no implied-in-fact contract where "neither party performed any of the tasks that they were allegedly expected to perform under the contract"). Honeywell, of course, did not develop, or even begin to develop, software to meet Universal's needs. More tellingly, however, Universal also acted as if it was

---

[7] A counter-factual illustrates this point. Imagine Honeywell had developed software that it thought fit Universal's needs, but Universal brought a breach of contract anyway, arguing Honeywell's software did not meet Universal's specifications (or did not operate as Universal needed or was delivered late). On this record, a court could not determine whether Honeywell fulfilled its part of the bargain because the material terms of the purported agreement are not discernible.

not bound by the terms of the agreement—actively seeking out alternative sources of surveillance technology despite its purported promise to purchase all necessary security equipment from Honeywell.  As early as September 2013, Universal entered into negotiations with OpenEye to develop Raven-branded software—precisely what Universal now claims was the object of the agreement with Honeywell—because Elkins "c[ould]n't take it anymore" with Honeywell.  Furthermore, Universal began shopping its Raven IP software to customers in May 2014—after the agreement with Honeywell purportedly came into effect—and sold its first Raven IP system on September 22, 2014—the day Universal claims Honeywell breached the agreement.  That both Honeywell and Universal undertook actions in conflict with the terms of the purported agreement indicate that the parties never intended to be bound.

 Taken together, Honeywell and Universal's communications and conduct during  2014 fail to demonstrate that the parties manifested an objective intent to incur an obligation.  Because no "meeting of the minds" occurred, no implied-in-fact contract existed between Honeywell and Universal to develop Phase Three of the Get Well Plan, and Honeywell is therefore entitled to summary judgment on Universal's contract claim.[8]

### B.  Honeywell's Contract Claim

Honeywell also moves for summary judgment on its crossclaim for breach of contract.  Honeywell claims that on November 12, 2015, the parties entered into a binding contract via email communications, which provided that Universal would purchase 1,350 Raven DVRs from

---

[8] Because Honeywell is entitled to summary judgment on Universal's contract claim, the Court need not reach Honeywell's two other outstanding motions.  First, pursuant to Federal Rule of Civil Procedure 37(c)(1), Honeywell moved to strike the declaration of Sheppard—OpenEye's CEO—submitted by Universal, on the ground that Universal failed to "provide information or identify [Sheppard] as required by Rule 26(a) or 26(e)(1)."  Fed. R. Civ. P. 37.  The motion is moot because, even considering Sheppard's Declaration, the undisputed facts establish that Honeywell is entitled to summary judgment on Universal's contract claim.  Second, Honeywell moved to preclude Universal's proposed damages expert pursuant to Federal Rule of Evidence 702.  Universal's proposed expert assumed liability on behalf of Honeywell and focused only on the damages Universal suffered.  Because Honeywell is entitled to summary judgment on the contract claim, the question of whether Universal suffered damages is moot, as is whether Universal's expert meets the requirements of Rule 702.

Honeywell under the terms of the still applicable 2013 agreement.  Honeywell further claims that Universal breached that agreement by failing to purchase all 1,350 units.

As discussed, to establish a breach of contract claim, Honeywell must show: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages."  *Ware*, 322 F.3d at 225 (internal quotations and alterations omitted).  Here, the record establishes that Honeywell and Universal entered into an agreement, and that Universal breached that agreement.  Indeed, Universal does not dispute the factual basis for Honeywell's claims.  On November 12, 2015, Honeywell's Trilk emailed Elkins, stating that "[Honeywell] can make a last-time-buy to secure what is needed for the 1350 units we have proposed, but just need to know you are committed to taking all 1350 units."  Elkins replied the same day, affirming Universal's intent to purchase 1350 Raven units: "Inder [Reddy, of Honeywell] assured me that nothing . . . would derail his commitment to provide the 1350 (might have been 1250 at that time) raven units. . . . We have clearly expressed our desire to secure these Raven units."  In addition, Elkins testified that he had promised to purchase Raven units from Honeywell in late 2015, and that while Universal purchased some amount of Raven DVRs, it had not bought "anywhere close to 1,350."

Universal advances several arguments as to why summary judgment should not be granted on Honeywell's crossclaims, none of which are ultimately persuasive.  First, Universal argues that the contract is not enforceable because it was the product of Universal's "attempt to mitigate its damages" from Honeywell's breach of the 2014 implied-in-fact contract.  The "duty" to mitigate damages arises only "upon the defendant's breach of contract," *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1448 (3d Cir. 1996) (citing *Bafile v. Borough of Muncy,* 588 A.2d 462, 464 (Pa. 1991)), but, as explained, Honeywell did not breach the implied-in-fact

contract because no such contract was ever formed.  Furthermore, there is no "duty" to mitigate; rather, mitigation is a "defense [that] may be invoked," "only when recovery is sought."  *S. J. Groves & Sons Co. v. Warner Co.*, 576 F.2d 524, 529 (3d Cir. 1978) (applying Pennsylvania law).  Accordingly, Universal cannot avoid its obligations under the 2016 agreement based on a "duty to mitigate."

Second, Universal appears to argue that the agreement is unenforceable because it was the product of economic duress: Elkins testified that "[a]t the time that I asked Honeywell to make those units available, it was almost immediately following Mr. Trilk telling me that Honeywell is done with us, relative to Raven," so "I implored Honeywell to produce those units" because "I was scared to death that [he] wouldn't have units available to sell."  This argument is also flawed.  Although "[i]t is . . . well settled that a contract made under economic duress may be avoided under proper circumstances," a party asserting duress must show that "(1) there exist such pressure of circumstances which compels the injured party to involuntarily or against his will execute an agreement which results in economic loss, and (2) the injured party does not have an immediate legal remedy."  *Nat'l Auto Brokers Corp. v. Aleeda Dev. Corp.*, 364 A.2d 470, 474 (Pa. Super. 1976) (quoting *Litten v. Jonathan Logan, Inc.*, 286 A.2d 913, 917 (Pa. Super. 1971)).  A contract formed under economic duress is voidable, not void, meaning "[a] party who possesses a power of avoidance for business coercion loses it by electing to affirm the transaction."  *Id.* at 476.  "Ratification results if a party who executed a contract under duress accepts the benefits flowing from it, or remains silent, or acquiesces in the contract for any considerable length of time after the party has the opportunity to annul or avoid the contract." *Id.*  Here, even assuming *arguendo* that Universal had a viable economic duress defense, it lost that defense when it ratified the agreement by purchasing DVRs from Honeywell under the terms

of the agreement.  *See id.* (holding contract not voided when defendant purchased land under the agreement).  Accordingly, Universal can not rely on an economic duress defense to avoid its obligations under the 2016 agreement.

Third, Universal argues that Honeywell cannot recover on the contract because after its formation Honeywell offered to sell Universal the remaining units for a reduced price—that is, Honeywell offered to enter into a substituted agreement.  Under Pennsylvania law, "a substituted agreement or novation . . . has the effect of extinguishing all rights and duties under the earlier agreement."  *Buttonwood Farms, Inc. v. Carson*, 478 A.2d 484, 486 (Pa. Super. 1984).  "The party asserting a novation . . . has the burden of proving that the parties intended to discharge the earlier contract."  *Id.*  (citing *Jacobson & Co. v. Int'l Env't Corp.*, 235 A.2d 612 (Pa. 1967)).  Here, Universal has not established that the parties agreed to the novation; in fact, the record evidence shows Universal rejected the offer.  Thus, the parties' obligations under the original contract were not extinguished.[9]

Lastly, Universal contends that the agreement is barred by Pennsylvania's statute of frauds, which provides that, for a contract for the sale of goods worth $500 or more, there must be "some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." 13 Pa. C.S.A. § 2201.  This argument is without merit, however, because there is a writing signed by Universal's agent indicating a contract was formed—namely, Elkins' November 12 emails.  *See Adani Exports Ltd. v. AMCI Exp. Corp.*, 2007 WL 4298525, at *11 (W.D. Pa. Dec. 4, 2007) ("Although the Court is unaware of any Pennsylvania court decisions addressing the question, many courts applying the

---

[9] To the degree that Universal argues that the offer of the novation indicates that the parties never agreed to enter into a contract in the first place, that argument also fails.  As discussed, the November 12 emails demonstrate that Honeywell and Universal entered into an agreement on the terms described above, and Elkins testified that he had promised to purchase Raven from Honeywell in late 2015.

UCC in other jurisdictions have concluded that emails may be used to satisfy the Statute of Frauds.") (collecting cases); *see also Penn Disc. Corp. v. Sharp*, 189 A. 749, 751 (Pa. Super. 1937) ("The requirements of the statute of frauds . . . are satisfied where a duly authorized agent signs in his own name.").  The statute of frauds is therefore satisfied.

Thus, Honeywell has established the first two elements of a breach of contract claim, namely that a binding agreement existed between the parties, and that Universal breached that agreement.  Honeywell has also established the third element of a breach of contract claim—damages.  Universal does not dispute the following facts: it agreed to pay $2,100 for each 16-channel Raven DVR, and $1,840 for each 8-channel Raven DVR; and, Honeywell holds parts and finished goods sufficient to supply 728 16-channel Raven DVRs  and 30 8-channel Raven DVRs to Universal.  Honeywell has thus established that it suffered damages as a result of Universal breach of the agreement.  Accordingly, summary judgment will be entered in favor of Honeywell on its contract claim.

An appropriate order follows.

**May 14, 2019**                                      **BY THE COURT:**

                                                      **/S/Wendy Beetlestone, J.**

                                                      _____
                                                      **WENDY BEETLESTONE, J.**